[No. B103522. Second Dist., Div. Three. Mar. 31, 1998.]

SAN PAOLO U.S. HOLDING COMPANY, INC., Plaintiff and Appellant,
v.
816 SOUTH FIGUEROA COMPANY et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III, subparts 2., 3., 4., 5., and 6.

**COUNSEL**

Epport & Richman, Steven N. Richman, Beth Ann R. Young and Laura E. McSwiggin for Plaintiff and Appellant.

Allen, Matkins, Leck, Gamble & Mallory, Patrick E. Breen, Mark R. Hartney and Gregory G. Gorman, for Defendants and Appellants.

**OPINION**

**KITCHING, J.—**

I

### INTRODUCTION

Code of Civil Procedure section 726, subdivision (b) provides that following a judicial foreclosure of real property, the secured creditor may bring a

motion to determine the amount, if any, of a deficiency judgment.[1] The measure of the deficiency will be the amount by which the indebtedness exceeds the "fair value" of the real property.

The issue in this appeal is the definition of the term "fair value."

We define "fair value," within the context of section 726, subdivision (b), as the fair market value of the real property, as of the date of the foreclosure sale, without any reduction for the adverse impact of the foreclosure and the one-year right of redemption that would temporarily lower the market value of the real property.

The 816 South Figueroa Company (the Company) defaulted on a bank loan. The San Paolo U.S. Holding Company, Inc. (the Bank), as successor in interest to First Los Angeles Bank, foreclosed on the real property collateral and obtained a $1,541,727.58 deficiency judgment.

The Bank appeals from the judgment entered following the section 726, subdivision (b) valuation hearing, and challenges the trial court's determination of the fair value of the foreclosed property, and the denial of interest at the default rate.

We conclude that the trial court used an improper measure to determine the fair value of the property, which led to an erroneous calculation of the deficiency judgment. We also find that the Bank was entitled to the higher default rate of interest from the May 7, 1994 date of default, through the August 24, 1995 date of entry of the summary judgment order. Accordingly, we reverse and remand for a new hearing.

The Company cross-appeals from the trial court's award to the Bank of interest, attorney fees and costs. We find the Company's section 998 offer was untimely, and that the Bank was entitled to interest on the loan and costs for expert witness fees. Accordingly, we affirm.

---

[1] Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

Subdivision (b) of section 726 provides, in relevant part, that ". . . [i]n the event that a deficiency is not waived or prohibited and it is decreed that any defendant is personally liable for the debt, then upon application of the plaintiff filed at any time within three months of the date of the foreclosure sale and after a hearing thereon at which the court shall take evidence and at which hearing either party may present evidence as to the *fair value* of the real property . . . therein sold as of the date of sale, the court shall render a money judgment against the defendant or defendants for the amount by which the amount of the indebtedness with interest and costs of levy and sale and of action exceeds the *fair value* of the real property . . . therein sold as of the date of sale." (Italics added.)

## II

### FACTUAL AND PROCEDURAL BACKGROUND

In 1984, the law offices of Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg were located at 816 S. Figueroa Street in Los Angeles. The building was owned by the Company, a building partnership comprised of the general partners of the law firm.

On or about December 7, 1984, the Company borrowed $5,250,000 from the Bank, and executed a promissory note (note) secured by a deed of trust to the property at 816 South Figueroa.[2] The loan was obtained to pay off an existing note on the building. In December 1990, the partners disbanded the firm and terminated their tenancy in the building. In June 1994, the Company stopped making payments and defaulted on the loan.

On September 21, 1994, the Bank filed an action for judicial foreclosure and recovery of a deficiency.[3] The Company answered and, challenging the status of the loan, cross-complained for, inter alia, declaratory relief, reformation of the note, cancellation of the guaranties, and breach of contract.[4] In response, the Bank cross-complained and alleged causes of action for declaratory relief, fraud, negligent misrepresentation, breach of oral contract and negligence.

In July 1995, the Bank successfully moved for summary judgment on its complaint and cross-complaint. The motion for summary judgment included a declaration regarding the Company's obligations from Duane King, vice-president of asset management for First Los Angeles Bank. King declared that the Company owed $4,809,436.70 principal and $391,295.07 interest from May 7, 1994, to June 30, 1995, with the regular rate of interest continuing to accrue at $995.30 per day. The motion attached the promissory note as an exhibit. Section 2 of the note provided that in the event of default, the interest rate would increase by 5 percent. King's declaration failed to show interest calculations or that the Bank requested the higher default rate of interest. On August 24, 1995, the trial court entered an order finding that the Company owed $4,809,436.70, plus interest, costs, and attorney fees.

[2] The attorneys and their spouses also signed personal guaranties for the loan, but those obligations are not an issue in this appeal.

[3] The complaint alleged causes of action for (1) specific performance of agreement to turn over rents, (2) appointment of a receiver, (3) judicial foreclosure of deed of trust, (4) constructive trust, (5) money had and received, (6) recovery of personal property, (7) breach of promissory note, (8) breach of guaranties, and (9) community property liability.

[4] The status of the loan, as recourse or nonrecourse, was an issue in the trial court. It is not an issue on appeal.

Furthermore, the trial court determined that the Bank was entitled to proceed by judicial foreclosure and obtain a deficiency judgment. The order contained the trial judge's notation that interest, costs and attorney fees would "[be] determined by [the] court."

At the foreclosure sale on January 17, 1996, the Bank purchased the building for $1.5 million, and subsequently sold the property to a third party for $1 million.

On January 26, 1996, the Bank filed a "Notice of Motion and Motion for Determination of Fair Market Value and Entry of Deficiency Judgment" pursuant to section 726, subdivision (b). The Bank presented a "market value" appraisal report by Charles Reinagel (Reinagel) and argument to support its position that as of January 17, 1996, the Company owed $6,039,573.79, plus attorney fees and costs; the value of the property was $1.5 million; and the Bank suffered a deficiency of $4,539,573.79, plus attorney fees and costs. In opposition, the Company argued that a "fair value" appraisal report by Arthur Gimmy (Gimmy) and evidence of the debt established by the "Amended Order for Issuance of Writ of Sale of Real Property," supported its position that since it owed the Bank only $4,809,436.70, and the value of the property was $5.1 million, the Bank did not suffer any deficiency.

On or about February 7, 1996, the Company served the Bank a written offer to compromise pursuant to section 998 for $2 million. The Bank did not respond, and the trial court later determined the offer was untimely.

On February 26 and 28, 1996, the trial court conducted the fair value hearing and heard testimony of appraisers Reinagel and Gimmy and argument of counsel. On March 8, 1996, the trial court determined that the fair value of the property on January 17, 1996, was $3,952,500 and the debt owed to the Bank was $5,519,227.58.

On April 12, 1996, the court entered judgment that the Bank recover a deficiency of $1,541,727.58, plus legal fees and costs. On August 5, 1996, the trial court amended the judgment to include $202,081.90 for the Bank's legal fees and costs. On or about August 30, 1996, the Bank filed a partial satisfaction in the sum of $1,880,199.81.

The Bank timely filed a notice of appeal.

The Company filed a notice of cross-appeal.

## III

## Discussion

*1. As a Matter of Law, Fair Value Is the Fair Market Value of the Real Property, as of the Date of the Foreclosure Sale, Without Any Reduction for the Adverse Impact of the Foreclosure and One-year Right of Redemption.*

 The Bank contends the trial court incorrectly interpreted the fair value analysis in *Rainer Mortgage* v. *Silverwood, Ltd.* (1985) 163 Cal.App.3d 359 [209 Cal.Rptr. 294]. This error, the Bank argues, improperly limited the amount of *its* deficiency judgment. We agree.

### a. *Fair Value Hearing*

#### (1) *The Property*

At the section 726, subdivision (b) hearing, the property to be valued consisted of approximately 7,750 square feet of land with a 5-story office building with 35,171 rentable square feet at 816 South Figueroa Street in the central business district of Los Angeles. The building was constructed in 1924. The Company purchased the property in June 1983 for approximately $3,752,634, and spent about $3,187,630 in 1984 to renovate and remodel the building.

#### (2) *The Bank's Expert*

Two expert witnesses testified. The first witness was Reinagel, the Bank's appraiser. Reinagel concluded that using market conditions at the time of the foreclosure sale, the property's fair value corresponded to its $1.5 million market value. His testimony repeated much of the information from his "Market Value Appraisal" which provided, in relevant part:

"Reconciliation of Value"

"We have considered three approaches to value in estimating the market value for the subject property as of the date of valuation. The value indicated by the approaches used in our analysis are:

| | As is |
|---|---|
| "Cost Approach | Not Applicable |
| "Sales Comparison Approach | $1,500,000 |
| "Income Capitalization Approach | $780,000 |

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"CONCLUSION

"Based upon our thorough review of the subject property, and according to the two approaches to value completed in this report, we have given the indication of the sales comparison approach, as supported by the conclusion of the income capitalization approach, the most significant weight in our final conclusion of value. Based upon the above analysis, it is our opinion that, as of the date of valuation, the leased fee value of the subject property, . . . . , is:

"ONE MILLION FIVE HUNDRED THOUSAND DOLLARS

"($1,500,000)

"We have also considered the concept of fair value in our analysis of the subject property. Fair value, as considered in this report, is explained as '. . . the intrinsic value of real property subject to judicial foreclosure, taking into consideration all the circumstances affecting the underlying worth of the property at the time of sale, without consideration of the impact of the foreclosure proceedings on the value.' This definition of Fair Value is from the case of Rainer Mortgage vs. Silverwood Ltd. (1985) 163 Cal. App.3d 359, 366 [209 Cal.App.3d 294]. Based on our understanding of this definition, we opine that the market value conclusion presented herein proximates fair value."

The appraisal defined market value as "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently and knowledge-ably, [sic] and assuming the price is not affected by undue stimulus." The report gave primary emphasis to the sales comparison approach to valuation and relied on data of properties sold in the area in 1995. The report found that economic recovery in Los Angeles from the state's recession had been relatively weak, and the high vacancy rates in older office buildings were caused by depressed rental rates in the downtown area.

Reinagel testified that he conducted the market value appraisal of the property by considering the historical background of the building and the renovation work performed in 1983-1984, by inspecting the property, and by searching for comparable sales and rental data. He opined there was a market for the property, which he valued at $1.5 million. This amount was based on current rents and sales in a depressed market.

Reinagel further testified that he relied on the *Rainer* case to define the concept of fair value, but found the case law definition restrictive. Reinagel explained: "There are three major considerations that come out of Raineer [*sic*] that we wanted to make sure were considered in our opinion of value. One, we didn't want to reflect a lower opinion of value just because the property was involved in foreclosure. . . . We didn't make punitive assumptions about the property because we were going through a foreclosure process, and we didn't. We assumed the property was going to be available to be sold in the market without constraints. And that was the first major concern. [¶] The second concern was there a value at all for the property or could it be a valueless asset like a toxic site or something like that. We had offers. We had sales in the market. We interviewed brokers. It was clear that the property had some value, and that contention is borne out by the current escrow price at 1.5 million. [¶] And then third, we felt as a consideration outlining Raineer [*sic*] we wanted to make sure that there was a market for this property. [¶] And in our update report between December of '93 and January of '96 we found seven sales, two unclosed [*sic*] offers and in about a two-year period for a rather unique asset in a relatively small geographic area we felt that the concerns in Raineer [*sic*] about value or about the market were met. And in fact for all practical purposes the market value equaled the fair value."

Reinagel further testified he would consider the same information for a fair value appraisal and a market value appraisal. While additional factors would be considered at a fair value hearing, Reinagel stated, "if you make the assumptions that the property is available and you could confirm the presence of a market and that there's a value to the asset, you would be in compliance with both the market value definition and the fair value definition."

Reinagel further testified that while intrinsic value is defined in textbooks as "the inherent worth of a thing," in his opinion, "intrinsic value in this context with a market in place is market value." He found that fair market value, intrinsic value, and fair value were all the same.

Reinagel further testified that he interpreted *Rainer* as requiring the property to be valued as of the date of the foreclosure sale.

### (3) *The Company's Expert*

The other witness was the Company's appraiser, Gimmy. Gimmy concluded that using prerecession market conditions and relying on comparable sales from 1986 through 1990, the intrinsic or fair value of the property as of

August 24, 1995, was $5.1 million. His testimony also reiterated much of the information from his " 'Fair Value' Appraisal Report" which provided, in relevant part:

" 'Fair' Value Indications:

"Cost Approach: $5,500,000

"Income Approach: $4,800,000

"Market Approach: $5,100,000

"Value Conclusion: $5,100,000"

Fair value, in the report, was defined as "[t]he intrinsic value of the real property subject to judicial foreclosure, taking into consideration all the circumstances affecting the underlying worth of the property at the time of sale, without consideration of the impact of foreclosure proceedings on this value; and [¶] . . . [t]he intrinsic or underlying value of the property, which under normal circumstances would have significant value."

The report, in a section entitled "CONCEPT OF 'FAIR' VALUE AND VALUATION CONSIDERATIONS" stated, in relevant part:

"II. Factors to Be Considered In Determining 'Fair Value'

"The court in Rainer [*Mortgage* v. *Silverwood Ltd.* (1985) 163 Cal.App.3d 359] stated that ' "fair value" is to be determined by all of the circumstances affecting the intrinsic value of the property at the time of the sale.' [*Id.* at p. 367.] . . . .

"A review of cases from other jurisdictions, read in conjunction with relevant California cases, leads to the following list of factors which should be considered in determining 'fair value' under [California Code of Civil Procedure] section 726:

"1. The location of the property;

"2. The adaptability of the property for various uses, i.e., highest and best use;

"3. The improvements to the property, including a consideration of the quality of the improvements; their condition; the cost of construction; the cost of replacement; and physical depreciation.

"4. The potential (intrinsic) income from the property, and the valuation of such an income stream.

"5. Trends and cycles in the market.

"6. Sales of similar properties, that have not been affected by severely reduced market values, if warranted by the expectation of a return to normal market conditions, in the near future.

"7. Temporary conditions which artificially affect the price . . . .

"In applying the tests described above to the subject property, there are several areas which should be particularly considered. Major considerations include the effect of the recession and the financial institution crisis on the real estate market.

". . . . . . . . . . . . . . . . . . . . . . . . .

"Summary

"In summary, *it is the opinion of the appraisers, that the intrinsic or 'Fair' value of the subject property is most accurately represented by 'pre-recession' market conditions, that were experienced prior to the severely deteriorated market conditions that currently exist (which are also considered to be temporary in nature).*

"The inherent value ('fair' value) of real estate, is typically based on the concept that under normal market conditions, the investor/borrower is entitled to recovery of invested capital, plus a payment for the use of capital. This concept prevails in the real estate market, just as it does in other markets. However, due to fluctuating market conditions, these conditions do not always exist. The 'fair' value concept does not necessary [*sic*] assume that the investor's/borrower's recovery will be complete. However, it does assume that the investor/borrower is not put in 'double jeopardy', in the instance of temporary (artificial) declines in market conditions, in conjunction with a judicial foreclosure proceeding. Consequently, market value and 'fair' value do not always correlate." (Italics added.)

Gimmy testified that he conducted a fair value appraisal of the property as opposed to a fair market value appraisal. The difference, Gimmy explained, is that "[f]air market value is a legal description used in condemnation cases in California, and it means the highest price in terms of money a property will bring on the open market. [¶] Fair value is a special concept of law in

California that deals with judicial foreclosures." He examined the effect of the depressed Los Angeles market condition on these two valuation methods and stated, ". . . [M]arket value is extremely depressed as compared to a normal market whereas fair value is a concept that deals with what I would call a typical or normal market." He considered the market at the date of foreclosure and the market over the past 10 years. Gimmy did not conduct a traditional market value assessment of the property, as the current market value was irrelevant to the valuation. The appraiser explained it was not necessary to consider the fact of a depressed market cycle in the valuation.

Gimmy further testified he used the cost approach, the sales comparison approach, and the income approach methods to determine the fair value of the property. He gave greatest emphasis to the sales comparison approach. He further testified that the distressed market conditions that existed in the area of the property did not represent normal market conditions. Current market rates were 30 to 40 percent below normal market rates. Normal market conditions, Gimmy explained, were represented by the years 1985 through 1989. Therefore, Gimmy testified, when he considered comparable sales and rents, he adjusted the 1996 rents to what he determined to be the normal market in or around 1989.

Under normal market conditions, Gimmy opined, the fair value of the property was $5.1 million.

### (4) *The Trial Court's Ruling*

At the conclusion of testimony, the trial court took the matter under submission. On March 8, 1996, the trial court heard argument of counsel and ruled:

". . . This is all subjective determination made by two experts as to what their determination as to the fair value is.

"However, I think Mr. Gimmy's evaluation is a much stronger position than Mr. Reinagel's evaluation. I think the factors that Mr. Gimmy took into consideration in coming to his conclusion [were] more in line with Rainier [*sic*] than Mr. Reinagel, and I think his evaluation comes closer to reality than Mr. Reinagel.

"Based on Rainier [*sic*], my interpretation of Rainier [*sic*], however, I think that Mr. Gimmy's estimation also was somewhat inflated. . . . .

"What I have done, counsel, . . . , I rely upon primarily Mr. Gimmy's evaluation because I think that is the proper way to do an evaluation that he did, but I think it's somewhere between 20 and 25 percent.

"So I've come up to a fair value for the property at $3,952,500. And that's what I'm going to set as the fair value for the property."

### b. *Concept of Fair Value*

#### (1) *Judicial Foreclosure Procedures*

██ The fair value of the real property is determined at a section 726 hearing following a judicial foreclosure. "A judicial foreclosure proceeding may be initiated at any time after a default on the secured obligation. [Citation.] It is commenced by filing a complaint in the superior court of the county in which the real property is situated. [Citations.] In its 'decree for the foreclosure' the court, inter alia, directs the sale of the encumbered property, determines the amount to be paid the creditor-plaintiff, determines the personal liability of any defendants, e.g., debtor and guarantor, for payment of the debt, names the defendants against whom a deficiency judgment may be ordered, or declares that there shall be no deficiency judgment. [Citation.] If the right to a deficiency judgment is not waived or barred, the property is sold subject to the right of redemption . . . .

"The method of sale is through the execution of a writ of sale. [Citations.] The sale is at auction to the highest bidder . . . and terminates upon acceptance of the last and highest bid or when the sale proceeds are sufficient to satisfy the money judgment (i.e., the debt). [Citation.]

"If the sale proceeds are insufficient to satisfy the amount of the indebtedness, then the creditor may apply to the court within three months of the date of the sale for a deficiency judgment subject to the 'fair value' limitation of section 726." (*Coppola* v. *Superior Court* (1989) 211 Cal.App.3d 848, 867-868 [259 Cal.Rptr. 811].)

#### (2) *"Fair Value" Limitation*

██ Fair value is the statutory process of valuation that controls the calculation of a claimed deficiency. (*Citrus State Bank* v. *McKendrick* (1989) 215 Cal.App.3d 941, 949 [263 Cal.Rptr. 781].) The fair value provision of section 726 limits the size of the deficiency judgment. It provides, in relevant part, that ". . . . upon application of the plaintiff filed at any time within three months of the date of the foreclosure sale and after a hearing thereon at which the court shall take evidence and at which hearing either party may present evidence as to the *fair value* of the real property . . . *therein sold* as of the date of the sale, the court shall render a money judgment against the defendant or defendants for the amount by which the

amount of the indebtedness with interest and costs of levy and sale and of action exceeds the fair value of the real property . . . therein sold as of the date of sale. In no event shall the amount of the judgment, exclusive of interest from the date of sale and of costs exceed the difference between the amount for which the real property . . . therein was sold and the entire amount of the indebtedness secured by the mortgage or deed of trust." (§ 726, subd. (b).)

The limitation did not exist until the 1930's, "when it was felt that real property could not be sold for its 'true' value. [Citations.]" (*Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35, 40 [27 Cal.Rptr. 873, 378 P.2d 97].) Prior to that time, "a mortgagee of real property was required to exhaust his security before enforcing the debt or otherwise waive all right to his security. [Citations.] However, having resorted to the security, whether by judicial sale or private nonjudicial sale, the mortgagee could obtain a deficiency judgment against the mortgagor for the difference between the amount of the indebtedness and the amount realized from the sale. As a consequence during the great depression with its dearth of money and declining property values, a mortgagee was able to purchase the subject real property at the foreclosure sale at a depressed price far below its normal fair market value and thereafter to obtain a double recovery by holding the debtor for a large deficiency. [Citations.] In order to counteract this situation, California in 1933 enacted fair market value limitations applicable to . . . judicial foreclosure sales . . . which limited the mortgagee's deficiency judgment after exhaustion of the security to the difference between the fair value of the property at the time of the sale (irrespective of the amount actually realized at the sale) and the outstanding debt for which the property was security. Therefore, if, due to the depressed economic conditions, the property serving as security was sold for less than the fair value as determined under section 726 . . . , the mortgagee could not recover the amount of that difference in his action for a deficiency judgment. [Citation.]" (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 600-601 [125 Cal.Rptr. 557, 542 P.2d 981], fns. omitted.)

This "fair value" limitation now "operate[s] to preclude a creditor from obtaining a deficiency judgment for the difference between the amount of the indebtedness and the amount realized from the foreclosure sale where the sale price was not equivalent to the fair market value of the property sold." (*Coppola* v. *Superior Court, supra,* 211 Cal.App.3d at p. 867.)

In light of this background, we consider the meaning of "fair value" within the context of a judicial foreclosure sale.

(3) *Case Law*

The "fair value" term has only been interpreted in two California cases.

First, *Nelson* v. *Orosco* (1981) 117 Cal.App.3d 73 [172 Cal.Rptr. 457] considered the state of title and merchantability when determining the circumstances affecting a fair value appraisal of foreclosed property. In *Nelson,* Orosco purchased residential property, "Canyon Road" from Nelson, and gave Nelson a promissory note for $111,424.09 secured by a second trust deed on Orosco's "Happy Valley Road" property (the property), the subject of this litigation. (*Id.,* at p. 76.) Orosco then sold "Happy Valley Road" to Woodburn, who had financed the purchase in part, by assuming a $100,000 first trust deed and lien against the property. The purchase/sale agreement did not mention Nelson's second trust deed. Subsequently, Orosco defaulted on the promissory note, and Nelson sued to foreclose on the second trust deed security. (*Ibid.*) Orosco defaulted in the action, Nelson was awarded a $67,116.35 judgment, and the court ordered that the property be sold. (*Id.* at pp. 76-77.) Prior to the sale, Woodburn filed an action against Nelson and Orosco and recorded a lis pendens against the property. (*Ibid.*)

Nelson purchased the property at the foreclosure sale for $101,000 and then applied for a deficiency judgment pursuant to section 726, which Orosco opposed. (*Nelson* v. *Orosco, supra,* 117 Cal.App.3d at p. 77.) Three expert witnesses testified to the fair value of the property as varying between $95,000 and $180,000, without considering the effect on the property of the Woodburn action or lis pendens. (*Ibid.*) The trial court valued the property at $180,000 after concluding that neither the lis pendens nor Woodburn's possession of the property could be considered in determining fair value under section. 726. (117 Cal.App.3d at p. 77-78.) Nelson was denied a deficiency judgment, and appealed. (*Id.* at p. 78.)

The appellate court reversed and held that " 'fair value' was to be determined by all of the circumstances attending the property at a foreclosure sale, including the state of its title and merchantability." (*Nelson* v. *Orosco, supra,* 117 Cal.App.3d at p. 79.) The court determined that ". . . no willing purchaser in an open market would have paid the full $180,000 for the property under the circumstances of Woodburn's recorded claim. Such a buyer would take the property subject to the expense and vicissitudes of a lawsuit which *could* result in the purchaser obtaining nothing at all for the price he had paid." (*Ibid.*) The court further determined that "the critical situation [in this case], unconsidered by the trial court, was the clouded and patently unmerchantable condition of the property's title." (*Ibid.*) The trial court had misinterpreted section 726. (117 Cal.App.3d at p. 79.)

Four years later, *Rainer · Mortgage* v. *Silverwood, Ltd., supra,* 163 Cal.App.3d 359 considered the temporary impact of foreclosure proceedings, such as the nature of the sale and post-sale redemption, on a fair value

appraisal of the property. In *Rainer*, two limited partnership developers, Golden Oaks, Ltd. and Silverwood Ltd., borrowed money from Rainer Mortgage (Rainer) to finance two real estate developments. (*Id.* at p. 362.) They executed promissory notes secured by deeds of trust to the properties in the developments. The developers defaulted on the notes and stipulated to judgment for $442,798.33 on the Golden Oaks notes and $294,726.86 on the Silverwood notes. At the foreclosure sale Rainer purchased some of the properties. The total realized from the sale of Golden Oaks properties was $290,445.60, and $211,700 from the Silverwood properties. Rainer applied for a deficiency judgment pursuant to section 726. (163 Cal.App.3d at p. 362.) Appraisers offered evidence of "the market value of the properties in both a free market, fee simple absolute situation, and in a situation where all the circumstances attending a foreclosure sale were considered." (*Id.* at p. 363.) The trial court agreed with Rainer's "fair value" appraisal that "took into account the price-reducing circumstances of the foreclosure. These values approximated the amounts received at the foreclosure sales. Deficiency judgments . . . were entered. . . ." (*Ibid.*, fn. omitted.) The developers appealed. (*Ibid.*)

The appellate court reversed and held that "fair value" should "be construed as the intrinsic value of real property subject to judicial foreclosure, taking into consideration all the circumstances affecting the underlying worth of the property at the time of the sale, without consideration of the impact of foreclosure proceedings on this value." (*Rainer Mortgage* v. *Silverwood, Ltd., supra,* 163 Cal.App.3d at p. 367.) In reaching this conclusion, the court first determined that *Nelson* v. *Orosco, supra,* 117 Cal.App.3d 73 was inapplicable and limited to its own facts. (*Rainer* at p. 364.) The *Nelson* decision only considered the effect of a lis pendens, a factor that was not the product of the foreclosure, in computing fair value, and "did not hold that any circumstance *arising from* the foreclosure sale must necessarily be considered." (*Ibid.*)

Next, the appellate court reviewed the language and legislative history of section 726 and opined the purpose of the fair value provision "was to protect the defaulting mortgagor. [Citation.] To do this, the Legislature found it necessary to credit the borrower with the intrinsic or underlying value of the property." (*Rainer Mortgage* v. *Silverwood, Ltd., supra,* 163 Cal.App.3d at p. 366, fn. omitted.) While the appellate court acknowledged that subsequent amendments to section 726 eliminated the "intrinsic value" language from the statute, it still used that term when it concluded that the proper measure of fair value was the intrinsic value of the property unaffected by the disabilities of a foreclosure sale, to wit, the price-depressing effects of the sale and the right of redemption. (163 Cal.App.3d at pp. 366-367.)

■ With this background in mind, we define "fair value," within the context of section 726, subdivision (b), as the fair market value of the real property, as of the date of the foreclosure sale, without any reduction for the adverse impact of the foreclosure and the one-year right of redemption that would temporarily lower the market value of the real property. (*Nelson* v. *Orosco, supra,* 117 Cal.App.3d at p. 79; *Rainer Mortgage* v. *Silverwood Ltd., supra,* 163 Cal.App.3d at pp. 366-367.)

"Fair market value, by definition, is the highest price a willing buyer would pay. [Citation.]" (*Forty-Niner Truck Plaza, Inc.* v. *Union Oil Co.* (1997) 58 Cal.App.4th 1261, 1282 [68 Cal.Rptr.2d 532].) It is " '[a]n actual price, agreed to by a willing buyer and a willing seller, [and] is the most accurate gauge of the value the market places on a good.' [Citation.]" (*Id.* at pp. 1282-1283.) The term "intrinsic value," as used in the context of *Rainer,* means nothing more than the fair market value of the property without a reduction for the temporary price-reducing effect of the judicial foreclosure and the one-year period of redemption. To the extent *Rainer* can be read to go beyond this conclusion, we consider the language dicta and decline to follow it.

We now look at the position of the parties. The Bank and the Company both relied on *Rainer.* However, they had different interpretations concerning the date of the valuation and the use of current market conditions. Therefore the parties reached different results.

The Bank interpreted *Rainer* as defining fair value as the fair market value of the property at the time of the foreclosure without taking into account temporary market conditions such as the foreclosure sale and right of redemption that would depress the value of the property. To determine the fair value of the property at $1.5 million, the Bank considered comparable sales and the depressed economic conditions that existed at the time of the foreclosure sale.

By contrast, the Company relied on the "intrinsic" language of *Rainer.* Thus the Company defined "fair value" as the fair market value of the property in a "normal" market without taking into account temporary market conditions, such as the recession, which depressed the value of the property. The Company argued that *Rainer* started a "fair value" analysis with an assessment of the property's underlying or intrinsic worth. That evaluation required an examination of the property's actual or essential value, which under normal conditions would have significant worth, and not merely the amount which at any given time someone is willing to pay.

The Company argued that the essential value of the property could not be adequately determined in a depressed market. Since the market was in a deep

recession at the time of the foreclosure sale, the Company reasoned that reliance on current market transactions would not be a good indicator of "fair value." Therefore, the Company's appraiser looked at the condition of the market in years prior to the foreclosure sale and used comparable sales from 1986-1990. He viewed 1986 as the "normal" market period. He also selectively used 1996 land values in his calculations. Under those circumstances, the appraiser set the fair value of the property at $5.1 million.

Under the "fair value" definition we have articulated, we reject the Company's position. The Company disregarded existing market conditions on the date of the foreclosure sale. These conditions would have supported the entry of a deficiency judgment in favor of the Bank. Instead, the Company used the "intrinsic" language of *Rainer* as a means to arbitrarily readjust the valuation date to yield a higher price for the property, and limit or negate any award of a deficiency judgment. This interpretation is contrary to the law.

The language in section 726, subdivision (b) is clear: The value of property is determined as of the date of the foreclosure sale. The Company's valuation plan is inherently flawed, because it does not focus upon the date of the sale. As a result, it is erroneous as a matter of law. The date of the judicial foreclosure sale provides for certainty in the marketplace and ensures that all valuation approaches are based on the same date, i.e. the date of the judicial foreclosure sale.

As a matter of law, the trial court erred in relying on the Company's valuation plan and used this improper measure to determine the "fair value" of the property and the amount of the deficiency judgment. The judgment is reversed and the matter remanded for a new hearing consistent with the definition of "fair value" set forth in this opinion.

2.-6.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

### DISPOSITION

The portions of the August 5, 1996 (amended) judgment finding that the fair value of the property was $3,952,500, the debt owing to the Bank was $5,494,227.58, and the deficiency remaining after the sale was

*See footnote, *ante*, page 1010.

$1,541,727.58, are reversed. The matter is remanded to the trial court: (1) to conduct a new section 726 hearing consistent with the definition of fair value determined by the opinion, and, if necessary, determine the correct amount of the deficiency; (2) to recalculate the amount of debt owing to the Bank by including interest charges at the default interest rate under the note, from the date of default, May 7, 1994, through and including the date of the entry of the summary judgment order, August 24, 1995; and, (3) to enter an amended judgment. In all other respects, the (amended) judgment on the appeal and cross-appeal is affirmed. The Bank is awarded costs on appeal.

Klein, P. J., and Croskey, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied July 8, 1998. Mosk, J., was of the opinion that the petition should be granted.