Filed 11/30/21  Calvert v. Mbanugo CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARK CALVERT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>COLLIN A. MBANUGO et al.,<br><br>        Defendants and Appellants. | A161188<br><br>(Alameda County<br>Super. Ct. No.<br>RG16838781) |

Defendants Collin A. Mbanugo, Ogo Mbanugo, and the Mbanugo Revocable Trust (collectively Mbanugo) appeal from a deficiency judgment entered in this judicial foreclosure action.  The judgment, for $395,392, is based on the trial court's determination that the statutory fair value of the foreclosed property at the time of the sheriff's sale was $120,000.  This determination was based, in turn, on an appraisal submitted to the court by plaintiff Mark Calvert, the liquidating trustee in the Meridian Trust's Chapter 11 bankruptcy proceeding (collectively Meridian).

On appeal, Mbanugo maintains, as he did in the trial court, that he satisfied the underlying foreclosure judgment in full by way of a $1.2 million payment and therefore the property never should have been sold and no deficiency judgment should have been entered.  He alternatively asserts the

1

fair value of the property was substantially greater than determined by the court and that the sale should have been postponed.  We affirm.

## BACKGROUND[1]

In July 2007, Mbanugo obtained a loan from Meridian's predecessor for $1,957,500.  As security, Mbanugo gave deeds of trust on several properties, including what the parties refer to as the "residence" property and the "vacant" property.[2]

Mbanugo fell into arrears, and in 2016, Meridian filed the instant action for judicial foreclosure.

The following year, in October 2017, the trial court granted Meridian's motion for summary judgment and entered a judgment of foreclosure in the amount of $1,523,816.76 plus attorney fees and actual costs of foreclosure and sale.

In granting summary judgment, the court rejected Mbanugo's claim that he made payments between January 2014 and December 2016 totaling $584,000 pursuant to a "modification agreement" that extended the maturity date of his obligation by one year.[3]  Even assuming such an agreement, the trial court ruled Mbanuago "ha[d] not submitted evidence to demonstrate that [he has] paid Plaintiff the amount due under the settlement contract."  Although an appealable judgment (*Kinsmith Financial Corp. v. Gilroy* (2003)

---

[1]  We provide only a summary of the case here and discuss specific details in connection with our discussion of the issues raised on appeal.

[2]  Mbanugo purchased the vacant property in 1995 for $150,000.

[3]  These payments were assertedly as follows:  $200,000 paid in March 2016, $300,000 paid in December 2016, and a total of $84,000 paid in small increments between January 2014 and December 2016.

2

105 Cal.App.4th 447, 452–453 (*Kinsmith*)),[4] Mbanugo did not appeal the judgment of foreclosure.

More than a year later, when Meridian commenced moving forward with a sheriff's sale, Mbanugo, in March 2019, filed an ex parte "Application for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction Stopping Sheriff's Sale . . . and Dismissing Case With Prejudice," to prevent the sale scheduled for April 12, 2019. (Some capitalization omitted.) Mbanugo claimed, among other things, that he had paid Meridian $1.2 million in August 2018 pursuant to an agreement whereby Meridian would, upon Mbanugo's payment of that amount, release the liens securing "the [foreclosure] judgment."

Meridian filed opposition, pointing out Mbanugo's application for preliminary injunctive relief was based on the status of, and specifically the release of the lien against, the residence property, not the vacant property. However, the scheduled sheriff's sale was of only the vacant property. The $1.2 million Mbanugo paid consisted of proceeds from a refinance of the residence property, in exchange for a partial satisfaction of the foreclosure judgment as to that property; the balance of the judgment was to be paid by way of smaller increments. There was no evidence Meridian ever agreed to accept $1.2 million in full satisfaction of the foreclosure judgment or to

---

[4] Judicial foreclosure may be, and frequently is, a two-step process. The first results in a judgment of foreclosure, which embraces "all issues regarding the sale, the amount of the debt, [and] whether the debtor is liable for a deficiency if any." (*Kinsmith, supra,* 105 Cal.App.4th at p. 452.) When no appeal is taken from the judgment of foreclosure, it becomes "final and res judicata as to the issues determined." (*United California Bank v. Tijerina* (1972) 25 Cal.App.3d 963, 969.) The second step, if necessary, may yield a deficiency judgment, which is also appealable. (*Kinsmith,* at pp. 452–453; *United California Bank,* at p. 969.)

release the lien on the vacant property prior to payment of the foreclosure judgment in full.

A week before the scheduled sale, the trial court construed the request for a temporary restraining order as a request for a stay and issued an order staying the sheriff's sale for a month, until May 17, 2019. It also allowed Mbanugo to file a motion for an order deeming the foreclosure judgment satisfied by virtue of the $1.2 million payment.

Mbanugo filed the anticipated motion the following week based on his $1.2 million July 2018 payment and Meridian's asserted "release" of "items 14, 15, and 16 of the title report," which he claimed encompassed the vacant property.

Meridian opposed the motion, again asserting the only agreement the parties had reached provided for a release as to the residence property on payment of the $1.2 million July 2018 payment, and for payment of the balance of the foreclosure judgment by November 2018. In the meantime, Meridian would not proceed with a sheriff's sale. Mbanugo, however, failed to pay the remaining balance of the judgment.

The trial court credited Meridian's evidence and, following the hearing on the application for preliminary injunctive relief and motion to deem the debt satisfied, denied both. Although the order denying a preliminary injunction was appealable (Code Civ. Proc., § 904.1, subd. (a)(6)), Mbanugo did not appeal.

Following the hearing, Meridian served Mbanugo and his attorney with notice that the sheriff's sale was proceeding as scheduled, the following day. Meridian refused to agree to any further postponement.

The sheriff's sale took place as scheduled, and the vacant property sold for $76,000.

Meridian returned to court for a deficiency judgment. The matter first came on for hearing in October 2019, but was continued a number of times, until June 2020. The parties submitted briefing and evidentiary materials,[5] and the court entered judgment in August 2020. Among other things, the court found that the statutory fair value of the vacant property as of the date of the sheriff's sale was $120,000. The court further found the amount owed, including accrued interest, was $439,299.17. After credits for amounts paid and the fair value of the vacant property, the court entered a deficiency judgment in the amount of $395,392.82.

## DISCUSSION

### No Satisfaction of the Foreclosure Judgment

We first address Mbanugo's claim that the trial court erred in ruling that his July 2018 $1.2 million payment did not fully satisfy the foreclosure judgment.

To begin with, Mbanugo is precluded from raising this issue on appeal, having made the *identical* satisfaction claim in support of his application for preliminary injunctive relief, which the trial court heard and rejected on the merits, and which ruling he did not appeal.[6] While a decision on an application for a preliminary injunction does not constitute a decision on the ultimate rights in controversy, "[t]here is no inflexible rule as to the effect of the granting or denial of a preliminary injunction on subsequent litigation." (*Bomberger v. McKelvey* (1950) 35 Cal.2d 607, 612.) And while generally such

---

[5] Meridian submitted an original and a revised appraisal by Michael Turkull. Mbanugo submitted two appraisals, one by David Iphie and one by Thomas Dum Real Estate Appraisers.

[6] He also made this *identical* claim in his motion to deem the judgment satisfied, relying on the same evidence proffered in support of his request for preliminary injunctive relief.

a ruling will not have preclusive effect, it can be given such effect where "it appears that the court intended a final adjudication of the issue involved." (*Ibid.*)

Here, the record reflects the satisfaction claim was fully briefed by the parties on a fully developed record, it was dispositive of whether sale of the vacant property would proceed, and the trial court ruled, and unequivocally did so, on the merits. It is also apparent the trial court intended this to be the dispositive ruling on Mbanugo's satisfaction claim, as the court did not address the issue again in ruling on Meridian's motion for a deficiency judgment and in entering a deficiency judgment.

Having forgone the opportunity to appeal the order denying preliminary injunctive relief, Mbanugo is foreclosed from advancing his satisfaction claim on appeal from the later deficiency judgment. (See *Malatka v. Helm* (2010) 188 Cal.App.4th 1074, 1086 [evidentiary error that could have been raised in an appeal from an earlier order would not be reviewed on appeal from a later order]; *In re Janee J.* (1999) 74 Cal.App.4th 198, 206 [an appeal from a later appealable order cannot attack orders for which the time to appeal has passed].)

But even if that were not the case, there is no merit to Mbanugo's challenge to the trial court's ruling that his $1.2 million payment in July 2018 did not fully satisfy the foreclosure judgment and he was therefore not entitled to dismissal of the action.[7]

---

[7] It is unclear what standard of review Mbanugo maintains should apply to this ruling, since he commences the argument portion of his opening brief with an omnibus overview of the standards of review. The standard of review of an order denying preliminary injunctive relief is generally abuse of discretion. (See *City of Vallejo v. NCORP4, Inc.* (2017) 15 Cal.App.5th 1078, 1085.) And even if the issue is considered as subsumed within the deficiency judgment, the deferential substantial evidence standard would apply, given

As we have recounted, Meridian presented evidence that the only agreement the parties came to was for a release of the lien on the residence property in exchange for Mbanugo's July 2018 $1.2 million payment, the source of which was a refinancing of that property. Mbanugo further agreed to pay the balance of the foreclosure judgment (approximately $300,000) by November 2018, which he never did.

In sum, the record evidence amply supports the court's rejection of Mbanugo's full satisfaction claim.

### *The Deficiency Judgment*

#### *The Controlling Law*

Meridian sought the deficiency judgment pursuant to Code of Civil Procedure section 726, subdivision (b). This statutory provision "calls upon the trial court to impose on a borrower a money judgment in favor of the lender for the amount by which the borrower's indebtedness (with interest and costs) exceeds the judicially adjudicated fair value." (*Luther Burbank Savings & Loan Assn. v. Community Construction Inc.* (1998) 64 Cal.App.4th 652, 657 (*Luther*).)

"The fair value provision of Code of Civil Procedure section 726 is a product of the Great Depression. (*Roseleaf Corp. v. Chierighino* (1963) 59 Cal.2d 35, 40. . . .) Prior to 1933, a mortgagee was required to exhaust his or her security before proceeding directly against the mortgagor. Once the security had been sold, however, either by private or judicial sale, the mortgagee could obtain a full deficiency judgment against the mortgagor for the difference between the indebtedness and the amount realized at the sale. (*Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 600. . . .) During the

_____

the evidentiary showing made by the parties. (See *In re Marriage of DeSouza* (2020) 54 Cal.App.5th 25, 33.)

Depression, with its devastating effect on property values, this procedure permitted the mortgagee to buy the property at the foreclosure sale for a nominal sum and realize a double recovery by holding the mortgagor for a large deficiency. (*Ibid*; *Roseleaf Corp. v. Chierighino, . . .* p. 40. . . .)" (*Rainer Mortgage v. Silverwood, Ltd* (1985) 163 Cal.App.3d 359, 365 (*Rainer*).

"The fair value limitations were enacted in 1933 to remedy this situation. As originally enacted, however, Code of Civil Procedure section 726 provided that the deficiency judgment was limited to 'the amount by which the entire amount of the indebtedness due at the time of sale exceeded the *fair market value* of the real property or interest therein sold. . . .' (Stats.1933, ch. 793, § 1, p. 2119.) (Italics added.) The problem with this formulation was that the Depression had severely reduced market values for real property. For many pieces of property there simply was no market at all. (See Washburn, *The Judicial and Legislative Response To Price Inadequacy In Mortgage Foreclosure Sales* (1980) 53 So.Cal.L.Rev. 843, 875–883. . . .) Accordingly, giving the mortgagor a credit against the deficiency judgment for the greater of the sale price or the fair market value was often an empty protection." (*Rainer, supra,* 163 Cal.App.3d at p. 365, fns. omitted.)

"In 1937, the Legislature sought to address this problem. An amendment to Code of Civil Procedure section 726 was proposed which struck the 'fair market value' language. In its place, it was proposed that the court appoint an appraiser in the event a deficiency judgment was sought. The appraiser was to file with the court an appraisal 'stating the *intrinsic value* and also the market value if in the opinion of the appraiser there was a market for such property at the time and place of sale.' (Italics added.) Thereafter, a hearing for objections to the appraisal and supporting evidence was to be held. At the conclusion of the hearing, it was proposed that the

8

court entered a deficiency judgment 'for not more than the amount by which the entire amount of the indebtedness due at the time of the sale . . . exceeded the *intrinsic value* of the real property or interest therein sold at the time of sale.' Further, '[i]n determining intrinsic value, weight shall be given to evidence of market value only after it is established that there was a market at the time and place of sale for the kind of property sold.' (Assem.Bill No. 1918 (1937 Reg.Sess.) § 1.) The bill was subsequently amended by the Assembly to delete the provisions regarding the court-appointed appraiser, and the 'intrinsic value' language of the original bill was replaced with the present 'fair value.' (Assem. Amend. to Assem. Bill No. 1918 (1937 Reg.Sess.) Apr. 14, 1937.)" (*Rainer, supra,* 163 Cal.App.3d at pp. 365–366.)

"From these amendments, it is clear the Legislature's purpose in inserting the 'fair value' language into Code of Civil Procedure section 726, subdivision (b) was to protect the defaulting mortgagor. (*Roseleaf Corp. v. Chierighino, supra*, 59 Cal.2d at p. 40.) To do this, the Legislature found it necessary to credit the borrower with the intrinsic or underlying value of the property. The fair market value of the property was deemed an insufficient measure as circumstances might conspire to render valueless property which under normal conditions would have significant value. The Legislature therefore determined not to let the protection afforded a foreclosed mortgagor depend entirely on the vagaries of the marketplace. The mortgagor was to receive a credit for 'the fair value of the property at the time of the sale (*irrespective of the amount actually realized at the sale*). . . .' (*Cornelison v. Kornbluth, supra*, 15 Cal.3d at p. 601.) (Italics added.) The 'fair value' of foreclosed property is thus its intrinsic value." (*Rainer, supra,* 163 Cal.App.3d at p. 366, fn. omitted; accord *San Paolo U.S. Holding Co. v.*

*816 South Figueroa Co.* (1998) 62 Cal.App.4th 1010, 1023 (*San Paolo*) [" 'fair value' limitation now 'operate[s] to preclude a creditor from obtaining a deficiency judgment for the difference between the amount of the indebtedness and the amount realized from the foreclosure sale where the sale price was not equivalent to the fair market value of the property sold,' " quoting *Coppola v. Superior Court* (1989) 211 Cal.App.3d 848, 867].)

"Under normal conditions this intrinsic value will often coincide with its fair market value; the value a willing purchaser will pay to a willing seller in an open market. (*Kaiser Co. v. Reid* (1947) 30 Cal.2d 610, 623. . . .) This correlation is not fixed, however, and market value is only one factor the court should consider when determining 'fair value.' As discussed in *Nelson v. Orosco* [(1981)] 117 Cal.App.3d 73, 'fair value' is to be determined by all of the circumstances affecting the intrinsic value of the property at the time of the sale. This necessarily excludes the circumstances of the foreclosure sale. These are not factors that affect the intrinsic worth of the property." (*Rainer, supra,* 163 Cal.App.3d at pp. 366–367.)

The principal issue in *Rainer* was whether the fact foreclosed property was subject to the right of redemption could be taken into account in determining (and, specifically, reducing) "fair value." The appellate court held it could not, explaining "the right of redemption is limited to a year. After that time, it no longer serves to depress the marketability of the property." (*Rainer, supra,* 163 Cal.App.3d at p. 367.)

By way of summary, *Rainer* concluded, "the Legislature intended that 'fair value', as used in Code of Civil Procedure section 726, subdivision (b), be construed as the intrinsic value of real property subject to judicial foreclosure, taking into consideration all the circumstances affecting the underlying worth of the property at the time of the sale, without

10

consideration of the impact of foreclosure proceedings on this value." (*Rainer, supra,* 163 Cal.App.3d at p. 367; see *San Paolo, supra,* 62 Cal.App.4th at pp. 1026–1027 [explaining "term 'intrinsic value,' as used in the context of *Rainer*, means nothing more than the fair market value of the property without a reduction for the temporary price-reducing effect of the judicial foreclosure and the one-year period of redemption," and holding a "depressed" market does not justify departing from fair market value on date of sale].)

The court brought these principles to bear in *Luther*, stating, "[t]he statute itself fails to define fair value.  Courts interpreting the statute have defined it as a value that takes into account 'all of the circumstances attending the property at a foreclosure sale, including the *state of its title* and merchantability.' (*Nelson v. Orosco*[, *supra*,] 117 Cal.App.3d 73, 79. . . , italics added.)  However, the circumstances which the court must consider have to be external to the foreclosure process.  Thus, in reaching a fair value, the court must not take into account the dampening effect on sales price of the property's being foreclosed upon, because this is not a factor external to the foreclosure process. (*Rainer*[, *supra*,] 163 Cal.App.3d 359, 363. . . .)  So, a court's assessment of fair value begins with its analysis of one or more appraisals showing the likely sales price which a given piece of land would command in the open market if the land were entirely unencumbered and its title unclouded.  The court then considers those external factors that reduce the amount that a willing purchaser in an open market would pay to a lender for the property. (*Id.* at p. 364.)" (*Luther, supra,* 64 Cal.App.4th at pp. 657–658, italics omitted.)

In *Luther,* for example, the trial court "accepted and considered each side's appraisals suggesting *fair market* values for the property if it were unencumbered.  Borrowers' expert offered an unencumbered market value of

11

$634,000; lender's appraiser offered an unencumbered value of $210,000. The court ruled that a fair unencumbered value was $465,300." (*Luther, supra,* 64 Cal.App.4th at p. 658, italics added.) But this "was merely the court's first step. To arrive at a statutory 'fair value' for purposes of" of the statute, "the court next had to consider the amount by which any encumbrances or clouds on title might reasonably affect the property's actual sales price." (*Ibid.*)

The court explained that the function of this second step "is to allow the lender to seek a judgment in excess of the present value of the security; the value of the security to a lender is the equity in the property external of the fact of foreclosure and the subject indebtedness. If, for example, the property is clouded by some other encumbrance unpaid by a borrower at time of foreclosure, that amount is properly excluded from the equitable fair value of the property. The lender gets nothing in return for that portion of the property's value attributable to this encumbrance and passes that debt onto the foreclosure sale purchaser." (*Luther, supra,* 64 Cal.App.4th at p. 658.) Thus, the trial court properly took into the fact the foreclosed on property was subject to a tax lien—"whoever purchases the property, whether it be a third party, lender, or borrowers by way of redemption, will be obligated to pay the lien amount to the county tax collector in order to free the property's title of that particular encumbrance." (*Id.* at pp. 658–659.) "[T]he hypothetical willing, full-price purchaser would have paid $465,300, reduced by the tax lien of $152,505.70 for a total purchase price of $312,794.30. This $312,794.30, then, would be the 'fair value' which should have been used, and which was used, to reduce the deficiency judgment due to lender." (*Id.* at p. 659, italics omitted; see *San Paolo, supra,* 62 Cal.App.4th at p. 1027.)

12

### *The Trial Court's Fair Value Determination*

The trial court determined that the statutory fair value of the vacant property was $120,000 (which was approximately $44,000 more than the sale price). Since this was the exact " 'as is' market value" (fair value) assigned by Meridian's appraiser Michael Turkull in his revised, 112-page appraisal report, we assume, as have the parties, that the trial court relied on Turkull's revised appraisal.[8]

Mbanugo claims the court erred because its order did not expressly undertake the "two-step" analysis discussed in *Luther*. The record, however, demonstrates there was no need to undertake a "two-step" analysis.

To begin with, an examination of Turkull's revised report in light of the law discussing fair value, reveals that the appraisal took "into consideration all the circumstances affecting the underlying worth of the property at the time of the sale, without consideration of the impact of foreclosure proceedings on this value." (*Rainer, supra,* 163 Cal.App.3d at p. 367.) Indeed, Mbanugo cites to no place in Turkull's report where the appraiser factored into his fair market value determination any "adverse impacts" due to foreclosure.

Nor does Mbanugo identify any evidence of a market calamity, such as the Great Depression, which precipitated the enactment of Code of Civil

---

[8]  While generally a trial court's determination of the value of property is a factual issue reviewed under the substantial evidence standard (see *Trahan v. Trahan* (2002) 99 Cal.App.4th 62, 70 ["confirmation of the appraiser's report is primarily a factual determination, which must be affirmed if supported by substantial evidence"]), whether the court has misconstrued the meaning of statutory term "fair value" is a question of law we review de novo. (See *San Paolo, supra,* 62 Cal.App.4th at p. 1027 [court erred as a matter of law in considering market data that did not focus on the date of sale, but on years where market was better and purportedly more " 'normal' "].)

Procedure section 726. (See *San Paolo, supra,* 62 Cal.App.4th at pp. 1026–1027 [error to consider market data from assertedly stronger, more " 'normal' " market].) He likewise does not identify any "external factor," such as the tax liens at issue in *Luther*, that would "reduce the amount that a willing purchaser in an open market would pay to a lender for the property." (*Luther, supra,* 64 Cal.App.4th at p. 658.)

Thus, the record reflects that the instant case is one exemplifying that "[u]nder normal conditions" the statutory fair value of the property (or its "intrinsic value") "will often coincide with its fair market value; the value a willing purchaser will pay to a willing seller in an open market." (*Rainer, supra,* 163 Cal.App.3d at p. 366.)

It is therefore of no moment that the trial court did not, in its written order, expressly undertake a two-step analysis, first crediting Turkull's opinion as to fair market value and second adjusting that value to reflect the kinds of circumstances discussed in *Rainer, Luther* and *San Paolo.* There simply was no evidence of any circumstance requiring a second step. (See *Luther, supra,* 64 Cal.App.4th at p. 660 [Court of Appeal focused on substance of trial court's deficiency judgment, which was correct, and not fact that court's order did not expressly undertake two-step evaluation process].)

Mbanugo additionally claims Turkull's revised appraisal is flawed because Turkull erroneously assumed the vacant property is "landlocked," pointing out there are numerous easements that would allow for access.

Turkull's revised report does, occasionally, use the term "landlocked." But what Mbanugo overlooks is that the report also expressly discusses the easements associated with the property.

The revised report explains that the vacant property lies about 600 to 800 feet west of Skyline Boulevard but does not front onto any public street—

14

so the property is effectively landlocked. It goes on to discuss the five easements associated with the property and explains why they do not assuage access difficulties. A private road accessing the property would be in excess of 600 feet, and "[t]his is a key issue, as the City generally considers blind roadways in excess of 600 feet to be unsafe and would not be approved without some alternate form of access. Thus, to develop the entire parcel, at least two access points would need to be developed. . . . [¶] The City is keenly aware of fire safety issues and is reticent to approve long, blind roadways, particularly if they are narrow." Further, the construction cost of a 600 foot roadway would be in the $600,000 to $900,000 range.

Thus, contrary to Mbanugo's assertion, Turkull did not erroneously assume the vacant property was irretrievably landlocked. Rather, Turkull identified and described each of the five easements and went on to explain why their existence does not eliminate the very serious access problems affecting the fair market value of the property.

Mbanugo also asserts Turkull's "value of the vacant lot" was "based on wrong values and computations are [*sic*] too speculative and do not reflect the actual fair market value . . . on the day of sale." He provides no elaboration, however, except a single sentence referring to Turkull's discussion of subdivision possibilities, yielding 1, 2, 4, or 6 unit lots. Thus, he has waived the issue.[9] (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [" '[w]hen an appellant raises an issue "but fails to support it with

_____

[9] We note that in his recitation of the "facts," Mbanugo characterizes the development cost ranges Turkull provided as "wild calculations." The revised report explains, however, that the posited construction costs were based on information provided by individuals who were directly involved with small scale developments of nearby properties. The report also does not purport to give definitive costs but provides a range of significant costs for potential one-lot, two-lot, four-lot and six-lot developments.

15

reasoned argument and citations to authority, we treat the point as waived" ' "].)

Ultimately, Mbanugo is simply quarreling with Turkull's professional opinion as to the significance of the access problems and the regulatory approval and development costs, and their consequent impact on the value of the property. This does not establish that Turkull's opinion fails to constitute substantial evidence supporting the court's judgment.[10] (See *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 314 ["testimony of a single witness may be substantial evidence, including the testimony of an expert"].)

### *Refusal to Order Further Stay*

Mbanugo also asserts the trial court "erred when it allowed the sheriff's sale to proceed . . . a day after the hearing on" Mbanugo's application for a preliminary injunction and motion to deem the foreclosure judgment satisfied. He variously maintains that in proceeding with the sale forthwith, Meridian deliberately suppressed buyer interest and that if it had agreed to a further delay, he would have drummed up interest and more than one

---

[10] Given that Turkull's revised appraisal supports the deficiency judgment, we need not, and do not, address Mbanugo's complaints about Turkull's original appraisal (which did not discuss the easements) or the appraisal information he submitted to the court. We note, however, that the Iphie appraisal of $1.15 million did not value the property as of the date of the sheriff's sale but six months later and considered comparables with established access. It also assumed all required development approvals had been, or could be, obtained. The Dum Appraisal of $10.12 million, provided to Meridian's predecessor more than a decade earlier in 2007 (at the height of the real estate bubble), not only did not value the property as of the date of the sheriff's sale, but also included three "extraordinary assumptions," one of which was that "the current access is adequate to complete a residential subdivision." In addition, Mbanugo submitted only 10 pages of the 42-page Dum report.

potential buyer would have appeared at the sale, and the property would have sold for more than it did.

While he made these complaints in opposition to Meridian's motion for a fair value determination, he submitted no evidence in support of these claims. The sheriff's sale had been previously noticed at least twice, and Mbanugo thus had months to drum up interest in the property. And while only one bidder appeared, the statutory "fair value" requirement insured that Mbanugo would be credited with the fair value of the property, regardless of minimal attendance at the sale.[11]

## DISPOSITION

The judgment is AFFIRMED. Respondent to recover costs on appeal.

---

[11] Mbanugo also claims, for the first time on appeal, that he "could not exercise [his] right of redemption because of the pandemic." He never made any such a claim in the trial court, and therefore cannot pursue it on appeal. (See *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 [appellant waives factually based claim by failing to raise it in the trial court below].)

17

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Sanchez, J.

A161188, *Calvert v. Mbanugo et al*