Filed 7/1/15

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| WELLS FARGO BANK, N.A.,<br><br>    Plaintiff and Respondent,<br><br>             v.<br><br>6354 FIGARDEN GENERAL PARTNERSHIP et al.,<br><br>    Defendants and Appellants. | F067568<br><br>(Super. Ct. No. 11CECG01157)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Donald S. Black, Judge.

The Freeman Law Firm, Jordan M. Freeman; Wendel, Rosen, Black & Dean, Charles A. Hansen and Kevin R. Brodehl for Defendants and Appellants.

Coleman & Horowitt, C. Fredrick Meine III and Jennifer T. Poochigian for Plaintiff and Respondent.

This appeal presents issues of statutory construction involving Code of Civil Procedure section 729.060[1] and the calculation of the redemption price for real property sold by judicial foreclosure.  In general terms, the redemption price includes the amount paid by the purchaser at the foreclosure sale (1) adjusted upward for certain property

---

[1]    All further statutory references are to the Code of Civil Procedure unless stated otherwise.

related expenses incurred by the purchaser and (2) adjusted downward or offset for certain benefits the purchaser obtained from the property.

The questions of statutory construction essential to the resolution of this appeal involve subdivision (c) of section 729.060, which states: "Rents and profits from the property paid to the purchaser or the value of the use and occupation of the property to the purchaser may be offset against the amounts [included in the redemption price pursuant to] subdivision (b)."

First, when the property subject to redemption contains multiple parcels, some vacant and unimproved and some improved with offices occupied by rent paying tenants, is the sole measure of the offset "the value of the use and occupation of the property to the purchaser" for the entire property? We conclude it is not the sole measure because the statute allows the trial court to calculate the offset by adding (1) the amount of rents paid for the improved portion of the property with tenants and (2) the value (i.e., monetary worth) to the purchaser of the use and occupation of the unimproved and unleased portion of the property, if any such value was realized. In this case, the trial court's finding that the purchaser's use and occupation of the unleased portion had no value is supported by substantial evidence. Therefore, the trial court did not err in reducing the redemption price only by the rents paid.

Second, does the offset to the redemption price for "rents … paid to the purchaser" refer to gross rents or net rents? We conclude subdivision (c) of section 729.060 refers to net rents. Consequently, the redemptioner suffered no prejudice when the trial court subtracted the management fees and operating expenses related to the business of the renting units of the property from the redemption price as "reasonable amounts for … maintenance, upkeep, and repair of improvements on the property" (§ 729.060, subd. (b)(2)) because, if not treated as costs of maintenance and repair, those fees and expenses should have been deducted from the gross rents added to the redemption price. Thus, the final redemption price would have been the same if the management fees and operating

2.

expenses had been accounted for in calculating the net rents, rather than in calculating the maintenance and repairs.

We therefore affirm the order determining the redemption price.

## FACTS AND PROCEEDINGS

Plaintiff in this judicial foreclosure action is Wells Fargo Bank, N.A. (Wells Fargo).

Defendants are 6354 Figarden General Partnership, a California general partnership, and its general partners Ralph Thomas Freeman, Linda Kay Freeman, Spencer Freeman, Jordan Freeman, Jared Freeman and Sara Freeman (collectively, Borrowers).

In May 2008, Wells Fargo and Borrowers entered into a construction loan agreement and related documents pursuant to which Wells Fargo agreed to finance Borrowers' development of a 10-acre parcel of real property located inside the Figarden Loop in Fresno, California. Under the agreement, Borrowers could take advances totaling $4,362,500 to fund the development of the property. The loan was secured by a construction deed of trust recorded against the property.

In June 2010, the construction loan matured and Borrowers did not pay the outstanding balance of approximately $2.7 million.

In April 2011, Wells Fargo filed a judicial foreclosure action and sought the appointment of a receiver to take control of the property. The application for a receiver asserted (1) the deed of trust explicitly authorized the appointment of a receiver to collect rents and manage the property and (2) Borrowers were mismanaging the property, converting cash collateral, and not paying the property taxes.

The trial court issued an order appointing a receiver, limiting the receiver's fees to $2,500 per month and authorizing the receiver to employ a management company at not more than the greater of $2,000 per month or 5 percent of gross monthly rents.

In November 2011, the parties entered a stipulation for entry of a foreclosure decree that stated the amount of the debt secured by the deed of trust totaled $2,940,410. Pursuant to the foreclosure decree, the trial court issued a writ of sale to the Fresno County Sheriff.

In February 2012, the judicial foreclosure auction was held and Wells Fargo, the only bidder, purchased the property for a partial credit bid of $1,332,000. Wells Fargo then filed an application requesting the property's fair value be set at $1,454,762.70 and the deficiency judgment be set at $1,564,762.95.

In March 2012, Wells Fargo took possession of the property from the receiver and hired Dana Butcher Associates (DBA) to manage the property. The receiver filed a final accounting and subsequently was discharged by the trial court.

In response to Wells Fargo's application for a deficiency judgment, Borrowers argued the fair value of the property was over $3.1 million, which exceeded the indebtedness, and therefore Wells Fargo was not entitled to any deficiency.

In June 2012, after taking evidence and hearing argument, the trial court filed a thorough 22-page statement of decision. The court found the fair value of the property was $2,451,545.40, allocating $700,000 to the vacant land and $1,751,545.40 to the office buildings. The court subtracted this fair value determination from the amount of the indebtedness and awarded Wells Fargo a deficiency judgment of $576,466.41.[2]

Borrowers paid the deficiency judgment in full and, in November 2012, an acknowledgement of satisfaction of judgment was filed with the court.

---

[2] The parties subsequently stipulated to increase the judgment by $33,000 for Wells Fargo's attorney fees and $952.50 for its court costs.

4.

In December 2012, the parties resolved their dispute about who should be in possession of the property during the redemption period and, as a result, Wells Fargo and DBA surrendered the property to Borrowers.[3]

As to the redemption price, the parties were unable to agree on an amount. Consequently, in February 2013, Borrowers filed a petition requesting the court to determine the redemption price in accordance with the procedures set forth in section 729.070. The petition stated Wells Fargo demanded a redemption price of approximately $1.62 million while Borrowers asserted the price should be approximately $1.44 million. In support of their position, Borrowers argued that (1) Wells Fargo had included various types of expenses that the statute did not permit to be included in the redemption price and (2) the value of Wells Fargo's 296 days of use and occupation of the vacant portion of the property ($33,810) and the office buildings portion of the property ($164,657.10) should be subtracted from the redemption price.

In April 2013, the trial court filed a memorandum of decision explaining its determinations affecting the redemption price. The court addressed Borrowers' argument that the redemption price should be reduced by the value of the use and occupation of the property as follows:

> "The subject property consists generally of an approximately ten acre parcel, three acres of which is improved with a small office suite complex and seven acres of which is unimproved. While the office complex had a history of generating income, the vacant land did not. Moreover, the vacant land was poorly maintained and would have required

---

[3]     Borrowers contend that Wells Fargo's possession of the property during the redemption period was wrongful and the wrongful possession should affect how section 729.060 is interpreted and applied to the facts of this case. We conclude the statute does not contain separate formulae for calculating the redemption price based on whether the purchaser's possession was wrongful or proper. Therefore, we do not address the merits of Borrowers' wrongful possession allegation. Also, we note the settlement agreement is not part of the appellate record and, during oral argument, counsel disagreed as to its legal effect.

5.

some fairly substantial investment to have been put in a position where it would have the potential to generate any income, not only to clean up, but also to subdivide. In the court's view, allocating a use value to the vacant land under these circumstances would be speculative at best and so the request is denied. As to the office complex, the court finds the actual rents received by [Wells Fargo] during its occupation of the property is the appropriate amount of credit to be allowed [Borrowers] because the alternative, in the form of the opinion of Gregg Palmer, improperly assumes the complex was a full service office building, rather than individual office suites with a relatively high vacancy factor, even at the time [Wells Fargo] took possession."

As to Borrowers' argument that various expenses should not be included in the redemption price, the court found "the vast majority of the expenses incurred by [Wells Fargo] during its use and occupation of the property qualify as operating expenses and may be added to the redemption price." Except for specific items identified in the decision, the court stated Borrowers had not proved the challenged expenses were unreasonable or resulted in a permanent improvement to the property. As a result, the court stated it "allows all other costs claimed by [Wells Fargo], including management fees, as necessary for 'maintenance, upkeep and repair.'"

As directed by the court, counsel met and conferred to quantify the redemption price pursuant to the rulings and directions provided in the memorandum of decision. Then, proposed orders determining redemption price were submitted to the court.

On May 21, 2013, the trial court filed an order setting the redemption price at $1,581,542.17, which included (1) the $1,332,000 bid at the sale, (2) real property taxes, (3) insurance costs, (4) maintenance, upkeep and repair in the amount of $137,729.81, and (5) interest. The redemption price also reflected an offset of $82,910.28 for the gross rents received by Wells Fargo during the redemption period.

Borrowers paid the redemption price and filed this appeal.

6.

**DISCUSSION**

I.    STANDARD OF REVIEW

Questions of statutory construction present issues of law subject to independent review on appeal. (*Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019, 1026 (*Honchariw II*).) Therefore, we will independently resolve the meaning of the provisions in section 729.060 and their proper application to the facts found by the trial court.

Borrowers have not explicitly challenged the sufficiency of the evidence supporting the trial court's findings of fact. Nevertheless, some of the arguments presented by Borrowers suggest they are entitled to have this court draw inferences from the evidence that favor them. Because of these arguments, we repeat the rule often overlooked by appellants that the power of appellate courts reviewing express or implied findings of fact begins and ends with determining whether there is any substantial evidence, contradicted or not, that supports the trial court's findings. (*Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 21.) This rule means that we have no power "'to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.'" (*Ibid*.; see *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739 [superior court's express and implied findings of fact are accepted by appellate courts if supported by substantial evidence].)

II.   PRINCIPLES OF STATUTORY CONSTRUCTION

A reviewing court's fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. (*Honchariw II*, *supra*, 218 Cal.App.4th at p. 1027.) This task begins by scrutinizing the actual words of the statute, giving them their usual, ordinary meaning. (*Ibid*.)

   A.    Statutory Language with a Plain Meaning

When the statutory language, standing alone, is clear and unambiguous—that is, has only one reasonable construction—courts usually adopt the plain or literal meaning of

7.

that language. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

The plain meaning of the words of a statute may be disregarded only when the application of their literal meaning would (1) produce absurd consequences which the Legislature clearly did not intend or (2) frustrate the manifest purposes which appear from the provisions of the legislation when considered as a whole in light of its legislative history. (*Faria v. San Jacinto Unified School Dist.* (1996) 50 Cal.App.4th 1939, 1945; see *Bob Jones University v. United States* (1983) 461 U.S. 574, 583 [a well-established canon of statutory construction provides that literal language should not defeat the plain purpose of the statute]; *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [Court of Appeal's plain meaning approach to constitutional provision rejected to avoid absurdity]; see generally, Manning, *The Absurdity Doctrine* (2003) 116 Harv. L.Rev. 2387.])

B.      Ambiguous Statutory Language

When statutory language is "susceptible to more than one reasonable interpretation" (*Hoeschst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519), it is regarded as ambiguous and there is no plain meaning. The issue of whether statutory language is ambiguous, which is part of the broader inquiry into the proper interpretation of the statute, is a question of law subject to an independent determination on appeal. (Cf. *Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 619 [whether language in written contract is ambiguous presents a question of law subject to independent review].)

When statutory language permits more than one reasonable interpretation, courts must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the

statute, and avoid an interpretation that would lead to absurd consequences. (*Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1073 (*Honchariw I*).)

Courts determine the apparent intent of the Legislature by reading the ambiguous language in light of the statutory scheme rather than reading it in isolation. (*Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735.) In other words, the ambiguous language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. (*Ibid.*) In addition, courts may determine the apparent intent of the Legislature by evaluating a variety of extrinsic aids, including the ostensible objects to be achieved by the statute, the evils to be remedied, the statute's legislative history, and public policy. (*Honchariw I*, *supra*, 200 Cal.App.4th at p. 1073.)

III.    ISSUES AND RELATED STATUTORY TEXT

A.    <u>Questions of Statutory Construction</u>

The first question of statutory construction arises because Borrowers contend that the trial court erred when it reduced the redemption price only by the rents paid to Wells Fargo and made no reduction for the value of Wells Fargo's use and occupation of the property. Borrowers interpret the offset provision in subdivision (c) of section 729.060 to mean that, when a purchaser takes possession of the property, the only appropriate measure of the reduction to the redemption price is "the value of the use and occupation of the property to the purchaser" and "value" is not limited to the economic benefits actually realized by the purchaser from its use and occupation of the property. We reject this interpretation.

The second question of statutory construction is whether the offset to the redemption price for "rents … paid to the purchaser" refer to gross rents or net rents. (§ 729.060, subd. (c).) We interpret the word "rents" to mean net rents.

These questions of statutory construction require an analysis of the text of both section 729.060, subdivision (c) and section 729.090. Section 729.090 is relevant

9.

because it addresses the same subject as subdivision (c) of section 729.060 and the law requires courts to harmonize statutory provisions relating to the same subject matter. (*Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735.)

B.     Statutory Text Defining the Offset

Subdivision (c) of section 729.060 provides in full:

> "*Rents and profits* from the property paid to the purchaser *or* the *value* of the use and occupation of the property to the purchaser *may* be offset against the amounts [included in the redemption price pursuant to] subdivision (b)." (Italics added.)

The italicized text plays a prominent role in the questions of statutory construction presented. The legislative history to section 729.060 includes a comment, which discusses subdivision (c). That portion of the comment is quoted and discussed in part IV.A, *post*.

C.     Other Means for Recovering Rents and Profits Paid to the Purchaser

Section 729.090 provides in full:

> "(a) From the time of the sale until a redemption, the purchaser is entitled to receive from the person in possession the rents and profits from the property or the value of the use and occupation of the property.

> "(b) Notwithstanding subdivision (a), *the purchaser is liable to the person who redeems for any rents or profits that have been received by the purchaser* pursuant to subdivision (a).

> "(c) The purchaser, from the time of sale until redemption, is entitled to enter the property during reasonable hours to repair and maintain the premises and is entitled to an order restraining waste on the property from the court. Such order may be granted with or without notice in the discretion of the court." (Italics added.)

The legislative history to section 729.090 includes a comment that explains its provisions:

> "Section 729.090 is based on former Section 706 and 707 and the second sentence of the first paragraph of former Section 702. If there is a tenant on the property under a lease which preceded the lien under which the property

10.

was sold, the purchaser at the sale acquires only the lessor's reversionary interest and right to rents, and the tenant may remain in possession during the term of the lease. However, the purchaser is entitled to receive the rents from the property or the reasonable value of the use of the property. Such amounts are a credit on the redemption price (see Section 729.060) or may be recovered after redemption as provided in subdivision (b). If the purchaser is in possession of the property during the time between the sale and the redemption, the person who redeems is entitled to receive the reasonable value of the occupation and use of the property. *House v. Lala*[ (1963)] 214 Cal.App.2d 238, 245-46 …; *Christensen v. Forst*[ (1957)] 153 Cal.App.2d 465, 471-72 …. The provisions of former Section 707 extending the redemption period pending the determination of rents and profits are not continued. Former Section 707 provided a special procedure to resolve disputes concerning the existence and amount of a similar credit but provided for ultimate resort to an action for an accounting. Rents and profits that are not offset pursuant to Section 729.060(c) or determined pursuant to 729.070 may be recovered in an action…" (Assem. Com. on Judiciary, Rep. on Assem. Bill Nos. 707 & 798 (1981-1982 Reg. Sess.) reprinted at 16 Cal. Law Revision Com. Rep. (1982) pp. 2045, 2113-2114 (*Assembly Report*).)

## IV.   PROPER MEASURE FOR CALCULATING THE OFFSET

### A.   Discretion of Trial Court

The question of statutory construction presented by Borrowers' contention that the only appropriate measure for the offset in this case was "the value of use and occupation" (§ 729.060, subd. (c)) can be rephrased as whether the statute grants discretion to the trial court to choose between the alternate measures contained in the statute.[4] The textual basis for a grant of discretion is the word "may" that appears in the phrase "may be offset." (*Ibid*.)

---

[4]    The word "or" separates "rents and profits" from "the value of the use and occupation of the property" and marks them as alternatives. (§ 729.060, subd. (c); *Houge v. Ford* (1955) 44 Cal.2d 706, 712 [plain and ordinary meaning of the word "or" is to mark an alternative such as "either this or that"].)

The word "may" is not expressly defined by the Code of Civil Procedure.[5] Nevertheless, courts interpreting provisions in the Code of Civil Procedure have relied on the general rule that the word "may" grants the trial court discretion. (E.g. *In re Arnett* (2007) 148 Cal.App.4th 654, 657-658 ["may" in § 1278, subd. (a) grants the superior court discretion in deciding to grant petition for name change].) We rely on this general rule to conclude the word "may" as used in the phrase "may be offset" grants discretion to the trial court. (§ 729.060, subd. (c).) This conclusion does not end our inquiry. We also must decide the scope of that discretion—that is, what aspects of the trial court's decision are discretionary and what aspects are not.

First, we conclude section 729.060, subdivision (c) does not commit the redemptioner's *entitlement* to the benefit to the discretion of the trial court. Instead, the word "may" provides some flexibility as to when the redemptioner obtains the benefit of the rents, profits and value of use. The trial court has the discretion to allow the redemptioner the benefit as a reduction of the redemption price or, alternatively, to exclude that benefit from the calculation of the redemption price. If the trial court chooses to exclude the offset when calculating the redemption price, the redemptioner does not lose the benefit of the offset. Instead, the redemptioner is authorized by subdivision (b) of section 729.090 to recover the amount later. The statement in subdivision (b) of section 729.090 that the purchaser "is liable" to the redemptioner for rents and profits strongly indicates that the offset is discretionary only as to the timing and the redemptioner's ultimate entitlement to the benefits is not a discretionary matter. This interpretation is confirmed by the comment to section 729.060, which states:

> "Subdivision (c) is derived from the second sentence of former Section 707 pertaining to rents and profits and codifies the rule in *House v.*

---

[5] In contrast, many other codes include a provision stating the word "shall" is mandatory and the word "may" is permissive or discretionary. (E.g., Bus. & Prof. Code, § 19; Corp. Code, § 15; Evid. Code, § 11; Gov. Code, § 14.)

*Lala*[, *supra*,] 214 Cal.App.2d 238, 245-46 …, pertaining to the value to the purchaser of the use of the premises. If these amounts are not offset, they may be recovered as provided in Section 729.090 (15 Cal.L.Rev.Comm. Reports 2001; 82 A.J. 9356)." (*Assembly Report*, *supra*, 16 Cal. Law Revision Com. Rep. at p. 2111.)

Similarly, the comment to section 729.090 states that rents and profits "not offset pursuant to Section 729.060(c) or determined pursuant to 729.070 may be recovered in an action." (*Assembly Report*, *supra*, 16 Cal. Law Revision Com. Rep. at p. 2113.)[6] Therefore, the redemptioner's entitlement to the benefit of rents, profits and value of use is not discretionary.

Second, in the context of a single use or user property, we conclude the word "may" in subdivision (c) of section 729.060 provides the trial court with some discretion in choosing which of the three possible measures (i.e., rents paid, profits paid, or value of use) should be applied to the property. Allowing the trial court some discretion in choosing the measure would discourage attempts at manipulation that might arise if a mandatory standard were adopted. For example, if a single use property (such as a single family residence) is leased by the purchaser to a tenant, the credit received by the redemptioner ordinarily would be the amount of rent paid by the tenant. However, in some cases a different measure might be justified. If the purchaser leased the property to a family member or friend at below market rates, then the trial court should have the discretion to reject "rents … paid to the purchaser" as the measure for the amount of the offset and allow an offset equal to the value of the use and occupation of the property.

---

**6** Also, the interpretation is consistent with the wording of former section 707, which stated "'the amounts of such rents and profits *shall* be credit upon the redemption money to be paid.'" (*House v. Lala*, *supra*, 214 Cal.App.2d at p. 245, italics added.) The use of the word "shall" indicates that the redemptioner's entitlement to the offset was not discretionary under the predecessor statute. If the Legislature had intended to lessen the redemptioner's rights, the comments most likely would have mentioned the substantive change.

13.

(§ 729.060, subd. (c).) Therefore, we conclude the statute grants the trial court discretion to choose which measure is appropriate under the facts of a particular case.

Third, in the context of a multiple use or user property, we conclude the word "may" in subdivision (c) of section 729.060 provides the trial court with some discretion in choosing which of the three possible measures (i.e., rents paid, profits paid, or value of use) should be applied to a particular portion of that property. Thus, we reject Borrowers' interpretation that the value-of-use-and-occupation alternative must be applied to all portions for the property when the purchaser has possession of such a property. For example, if the property subject to redemption is a duplex and the purchaser lives in one unit and rents the other unit to a third party, the trial court has the discretion to apply (1) the value-of-use-and-occupation measure to the unit the purchaser uses as a residence and (2) the rents-paid measure to the unit leased to a third party. The trial court also would have the discretion to calculate the offset based on the value of the use and occupation of the leased unit, rather than the rent actually paid, if (for example) the leased unit is occupied by the purchaser's parents and the rent is below the market rate.

Borrowers' rely on a sentence in the comment to section 729.090 that states: "If the purchaser is in possession of the property during the time between the sale and the redemption, the person who redeems is entitled to receive the reasonable value of the occupation and use of the property." (*Assembly Report*, *supra*, 16 Cal. Law Revision Com. Rep. at p. 2113.) We do not think this sentence establishes the Legislature intended that a single measure for the offset be applied to every situation where a purchasers takes possession of a portion of the property and allows tenants to possess other portions.

Thus, we conclude trial courts have the discretion to choose the most appropriate of the three measures—that is, rents paid, profits paid, or value of use and occupation— for each portion of the property. Accordingly, the trial court is not locked into a single measure for the entire property. The comment to section 729.060 used the term "these

14.

amounts" and the phrase "they may be recovered" when referring to rents, profits and the value of use and occupation.  These references suggest that (1) one portion of a property might generate rents, another portion might result in the payment of profits, and a third portion might be used and occupied in a way that creates value for the purchaser and (2) all three types of benefits should be included in the calculation of the amount of the offset.  Therefore, we conclude the discretion granted by subdivision (c) of section 729.060 extends to the choice of the appropriate measure for a particular portion of the property.

B.      Meaning of "Value of the Use and Occupation"

Borrowers' arguments imply that the trial court committed legal error by misconstruing the term "value" when it applied the phrase "the value of the use and occupation of the property to the purchaser" (§ 729.060, subd. (c)) to the facts of this case.  Consequently, we address the meaning of the word "value" and the phrase in which it appears.

1.      Value

The word "value" has many definitions.  (See Webster's 3d New Internat. Dict. (1993) pp. 2530-2531 [definition of "value"].)  For instance, "value" can mean "the monetary worth of something."  (*Id*. at p. 2530.)  Also, "value" can be defined by reference to a particular method for determining worth, such as "marketable price usu. in terms of a medium of exchange."  (*Ibid*.)

The statutory provisions addressing redemption do not define the word "value." Furthermore, subdivision (c) of section 729.060 does not modify the word "value" with adjectives such as fair, fair market, intrinsic, or peculiar.  (See *San Paolo U.S. Holding Co., Inc. v. 816 South Figueroa Co.* (1998) 62 Cal.App.4th 1010, 1022 ["fair value" in § 726, subd. (b) refers to the fair market value of the real property, as of the date of the foreclosure sale, without reduction for the adverse impact of the foreclosure and one-year

15.

right of redemption would have on the market price]; Civ. Code, § 3355 [recovery of "peculiar value" of certain property].)

Generally, the words used in a statute are given their usual, ordinary meaning. (*Honchariw II*, *supra*, 218 Cal.App.4th at p. 1027.) Nothing in the text of the redemption statutes or related comments suggests that the Legislature used the term "value" in a technical or specialized sense. Also, the Legislature's many statutory enactments that use adjectives to modify the word "value" indicates the Legislature (1) recognizes that the word "value" has a relatively broad meaning and (2) knows how to express a specialized meaning when it wishes to do so. Therefore, we infer the Legislature used the word "value" in a general way, rather than in a technical or peculiar sense. (See § 16 [construction of words and phrases].) Accordingly, we conclude that the term "value" simply refers to monetary worth. (Webster's 3d New Internat. Dict., *supra*, pp. 2530-2531.)

### 2. *Limiting Prepositional Phrases*

The Legislature defined the relevant monetary worth by following the word "value" with the prepositional phrases "of the use and occupation of the property to the purchaser." (§ 729.060, subd. (c).) These prepositional phrases clearly demonstrate that the relevant monetary worth is not a price that would be reached in a hypothetical transaction between a willing buyer and a willing seller. Instead, "value … to the purchaser" means the relevant monetary worth must be determined by referring to the benefits derived or realized by the purchaser from its "use and occupation of the property."[7]

---

[7] Here, the trial court impliedly found that Wells Fargo's management of the property was reasonable—that is, was not frivolous or inefficient. In other words, Wells Fargo did not foolishly or maliciously squander or ignore an income or benefit stream that could have been derived from the property during the redemption period. Therefore, we do not address how the statute should be interpreted and applied when the purchaser acts unreasonably or in bad faith towards the property and its economic potential. (Cf.

16.

### 3. Question of Fact

In other contexts, the determination of value presents a question of fact. (See *EHP Glendale, LLC v. County of Los Angeles* (2011) 193 Cal.App.4th 262, 272; CACI No. 3501 [fair market value in eminent domain case].) We reach the same conclusion here. For purposes of section 729.060, the monetary worth to the purchaser of his or her use and occupation of the property presents a question of fact.

It follows that the trial court's determination of value is subject to review under the substantial evidence standard. (*Smith v. Adventist Health System/West*, *supra*, 182 Cal.App.4th at p. 739 [superior court's findings of fact are accepted by appellate courts if supported by substantial evidence].)

### C. Trial Court's Calculation of the Offset

Applying the foregoing statutory interpretations, we consider whether the trial court committed error (1) in choosing among the measures for calculating the offset or (2) in determining the value of Wells Fargo's use and occupation of certain parts of the property. The property can be divided into three distinct parts—rented office space, vacant office space, and vacant land—and we analyze each part separately.

### 1. Vacant Land

The property contains seven acres of vacant land. The trial court expressly found that the vacant land (1) had no history of generating income, (2) had been poorly maintained, and (3) would have required a substantial investment to be able to generate income. The court expressly stated that "allocating a use value to the vacant land under these circumstances would be speculative at best." This statement demonstrates the trial court applied the statutory measure for "the value of the use and occupation of the property to the purchaser" to the vacant land. (§ 729.060, subd. (c).) We conclude the

---

*Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 531 [recognizing, without accepting or rejecting, Court of Appeal decisions that *implied* a reasonableness and good faith requirement into statute governing offers to compromise].)

17.

trial court did not abuse its discretion in choosing this measure, which was appropriate because the vacant land generated no rents or profits.

Applying this measure, the court found the value to Wells Fargo of its use and occupation of the vacant land was zero or less—that is, the vacant land had no positive monetary worth to Wells Fargo during the period of its occupation. This finding of fact is reviewed under the substantial evidence standard. (*Smith v. Adventist Health System/West*, *supra*, 182 Cal.App.4th at p. 739.)

The evidence supporting the finding of no value includes Spencer Freeman's testimony that (1) he was not aware of any person or entity that was or would be willing to rent the vacant portion of the property, (2) he was not aware of Borrowers ever attempting to market for rental the vacant portion of the property, (3) when Borrowers were in control of the property, the vacant portion was used as a dump by third parties who left behind mounds of dirt and piles of construction debris, and (4) the vacant portion of the property would need to be cleared and graded to make it usable for rental purposes.

Along similar lines, certified real estate appraiser Gregg Palmer, an expert hired by Borrowers, testified that he was aware that Wells Fargo was making no economic use of the raw land portion of the property and, when he appraised the property on March 1, 2012, the vacant portion of the land was poorly maintained and unusable. Also, Palmer's opinion that the rental value of the vacant land for the period Wells Fargo was in possession was $34,060.27 was based on a 6 percent capitalization rate applied to the trial court's earlier determination that the fair value of the vacant land was $700,000. Thus, Palmer's opinion was not based on any benefits or monetary worth realized by Wells Fargo from its use and occupation of the vacant land.

The testimony of Spencer Freeman and Palmer amply supports the trial court's finding of fact that Wells Fargo's use and occupation of the vacant portion of the land had no value to Wells Fargo during its time of possession.

Borrowers do not explicitly challenge the trial court's finding of no value by arguing the finding is not supported by substantial evidence. They indirectly challenge the finding by arguing Wells Fargo's occupation of the property had value to Wells Fargo because Wells Fargo "simply would not have vigorously fought for six months to retain possession of something that had no value to it." This argument suggests Borrowers believe we are obligated by law to evaluate the evidence and draw an inference favorable to them and contrary to the trial court's findings. Such is not the law of California. When reviewing factual determinations, appellate courts do not reweigh the evidence on appeal and must give the prevailing party the benefit of every reasonable inference that can be drawn from the evidence. (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 544; *Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.) Under this rule, we are not authorized to infer from Wells Fargo's fight to maintain control of the property that the vacant land had a positive monetary worth to Wells Fargo during the period Wells Fargo controlled that land. Drawing this inference is improper because other reasonable inferences are possible. For instance, one could reasonably infer from the evidence presented that Wells Fargo wanted control over the vacant land to assure the land was maintained in a condition that would not adversely affect (1) Wells Fargo's attempts to find tenants for the vacant office space or (2) the price at which the vacant land could be sold after the redemption period. This inference as to Wells Fargo's motivation is supported by the evidence regarding the condition of the vacant land when Wells Fargo took possession after the foreclosure sale. Therefore, we reject the contrary inference advocated by Borrowers.

Borrowers also contend that the vacant land need not produce income to have value. This contention is accurate insofar as it goes. Besides receiving income, the possessor of land can realize value in the form of reduced expenditures. For example, the purchasers in *House v. Lala*, *supra*, 214 Cal.App.2d 238, realized monetary worth from their possession of the property in question because they used the property as their

19.

residence. (See *House v. Lala* (1960) 180 Cal.App.2d 412 [plaintiff's affidavit stated "'My wife and I have lived in the premises … since April of 1955'"].) The appellate court determined the purchasers' use of the property should be credited against the redemption price because former section 707 referred to credits for "rents and profits" and the term "profit" was defined by Black's Law Dictionary to include a benefit accruing to the occupant of land from its actual use. (*House v. Lala*, *supra*, 214 Cal.App.2d at pp. 245-246.) A benefit accrued to the purchasers because they used the property as their residence and did not have to pay for housing elsewhere.

In the instant case, there is no evidence that Wells Fargo's possession of the vacant land produced a benefit in the form of cost savings or reduced expenditures. Furthermore, the proposition that possession of vacant land can have a value even if the land produces no income does not logically establish the proposition that possession of vacant land not producing income *always* has a monetary worth. Therefore, Borrowers' argument that possession of land can have value even if it produces no income does not establish the trial court erred in finding Wells Fargo's use and occupation of the vacant land had no positive monetary worth to Wells Fargo.

In addition, Borrowers argue the trial court should not have considered the condition of the vacant land at the time Wells Fargo took possession when it determined the value of the use and occupation of the land. This argument is unsupported by legal authority and makes little practical sense. The condition of the vacant land directly affected how Wells Fargo could put it to "use" and thus affected the monetary worth or benefits Wells Fargo was able to derive from its "use and occupation." (§ 729.060, subd. (c).) Borrowers' arguments overlooks the economic reality that, in situations like the one presented in this case, taking possession of vacant land can be a burden that provides no value during the time of occupation.

Borrowers also contend "the trial court's comment that any use of the Land would be speculative or hypothetical is misplaced here as [Wells Fargo] did in fact occupy the

20.

Land." This argument incorrectly implies that all occupancy of land has value to the occupier and is contrary to the definition of "value" adopted in part IV.B.1, *ante*.

In conclusion, when the trial court determined that Wells Fargo's use and occupation of the vacant land had no value, it decided a question of fact. That determination is the equivalent of stating the Borrowers failed to prove that the use and occupation of the vacant land had a monetary worth to Wells Fargo. Where an issue subject to appellate review turns on a failure of proof at trial, the question for a reviewing court is whether the evidence compels a finding in favor of the appellant as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) The finding is compelled if the appellant's evidence was "'uncontradicted and unimpeached'" and "'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Ibid*.) In this case, Borrowers' evidence was tailored to a legally incorrect view of the concept of "value" and did not identify any monetary worth actually realized by Wells Fargo for its possession of the vacant land. Consequently, the evidence did not compel the trial court to find Wells Fargo realized value from its possession of the vacant land.

In summary, the trial court committed no legal or factual error when it determined that no value should be attributed to Wells Fargo's use and occupation of the vacant land.

### 2. *Office Space—Occupied and Vacant*

As to the office complex portion of the property, the court determined (1) the rents paid to Wells Fargo was the appropriate measure of the offset for the occupied office space and (2) the value of the use and occupation was the appropriate measure for the offset for the vacant office space. In applying the latter measure, the trial court impliedly found that Wells Fargo derived no value from its use and occupation of the vacant offices during the redemption period.

21.

The trial court rejected Borrowers' position regarding value because that "alternative, in the form of the opinion of Gregg Palmer, improperly assumes the complex was a full service office building, rather than individual office suites with a relatively high vacancy factor .…"

First, we conclude the trial court did not abuse its discretion in selecting the measure applicable to the rented offices and the vacant offices. Second, we conclude the court's implied finding that the vacant office space had no value to Wells Fargo is supported by the evidence.

Borrowers argue that Palmer's testimony was the only evidence before the trial court as to the value of Wells Fargo's use and occupation of the property because Wells Fargo presented no other methodology for determining the value of its use of the vacant office space during the redemption period. In Borrowers' view, the trial court should have adopted Palmer's uncontested opinion as to the value of Wells Fargo's use of the office space.

First and most importantly, Borrowers' position is based on misinterpretations of subdivision (c) of section 729.060. Palmer testified that, in his opinion, the fair rental rate for the office portion of the property for a single user was $1 per square foot. Using this figure, Palmer determined the rental value for the office portion of the property during the period of Wells Fargo's possession was $164,657.10. Borrowers treat Palmer's estimate of rental value as the equivalent of the value of Wells Fargo's use and occupation of the office space. The primary flaw in Borrowers' approach is that it does not use the correct definition of value—namely, the monetary worth that Wells Fargo realized from its possession of the office buildings. As a result, Palmer's opinion was irrelevant as a matter of law to the calculation of the offset stated in subdivision (c) of section 729.060.

Second, even if Palmer's opinion had addressed the legally correct definition of value, a trial court is not required to accept lay or expert opinion testimony simply

22.

because it is uncontested. One practice guide addressed uncontested testimony by stating:

> "Uncontradicted testimony in appellant's favor does not necessarily conclusively establish the pertinent factual matter: The trier of fact is free to *reject* any witness' uncontradicted testimony; and the court of appeal will affirm so long as the rejection was not arbitrary. [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) ¶ 8:54, pp. 8-25 to 8-26.)

Similarly, "[s]o long as it does not do so arbitrarily, a [trier of fact] may entirely reject the testimony of a[n] …expert, even where the [opposing party] does not call any opposing expert and the expert testimony is not contradicted." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633.)

Therefore, we conclude the trial court was not required to accept Palmer's opinion as to rental value as establishing the value of Wells Fargo's use and occupation of the property.

V.     MAINTENANCE, UPKEEP AND REPAIR

The redemption price calculated by the trial court included "[m]aintenance, repair and upkeep costs in the amount of $137,729.81." This amount included expenses incurred by Wells Fargo that the trial court found "qualify as operating expenses." The court also allowed management fees as necessary for maintenance, upkeep and repair.

The trial court rejected certain expenses claimed by Wells Fargo, concluding those expenses resulted in permanent improvements and, thus, did not qualify as maintenance, upkeep or repair. For example, the court classified as permanent improvements (1) the demolition and removal of a concrete building pad and (2) the installation of an alarm system.

A.     Contentions of the Parties

Borrowers contend the trial court misinterpreted section 729.060, subdivision (b)(2) in determining what constituted "reasonable amounts for … maintenance, upkeep,

23.

and repair of improvements on the property." (§ 729.060, subd. (b)(2).) Borrowers contend the terms "maintenance, upkeep, and repair" should be given their ordinary meanings and, moreover, are limited by the phrase "of improvements on the property." (§ 729.060, subd. (b)(2).) Borrowers interpret the limiting phrase as excluding the costs incurred to maintain the property's tenant occupancy level, such as the cost of developing a website used to attract new tenants. In Borrowers' view, tenant occupancy levels are not "improvements on the property" for purposes of section 729.060, subdivision (b)(2). Also, Borrowers contend no "improvements on the property" were maintained or repaired by the development of a website.

Wells Fargo contends that there is no support for the argument that "maintenance, upkeep, and repair" was intended as an all-inclusive list of the items recoverable as part of the redemption price. In Wells Fargo's view, section 729.060, subdivision (b)(2) "was designed to allow for flexibility in terms of what qualified as 'maintenance, upkeep and repair.'" Wells Fargo also contends, in effect, that the test for distinguishing between amounts spent on maintenance and amounts spent on permanent improvements should be applied to the expenses of operating the rental business. As the amounts spent operating the rental business did not pay for any permanent improvements, Wells Fargo reasons that those amounts should be categorized as maintenance and upkeep.

### B. Assumptions and Prejudice

#### 1. *Reversal Requires Prejudice*

Generally, an appellant must demonstrate prejudice to obtain a reversal. (Cal. Const., art. VI, § 13.) Under section 475, no decision shall be reversed by reason of any error "unless it shall appear from the record that such error … was prejudicial … and that a different result would have been probable if such error … had not occurred …."

24.

## 2. *Assumption Regarding Maintenance*

For purposes of this appeal, we assume without deciding that the operating expense and management fees incurred by Wells Fargo did not qualify as "maintenance, upkeep, and repair of improvements on the property" for purposes of section 729.060, subdivision (b)(2).

This assumption leads to the question of whether Borrowers were prejudiced by the inclusion of those expenditures in the amount ultimately awarded as the redemption price. In particular, if those expenditures should have been taken into account elsewhere in the calculation of the redemption price, then no prejudice would have resulted from treating those amounts as maintenance and repairs. More specifically, if the rents offset in section 729.060, subdivision (c) referred to *net* rents, then the rents offset would equal (a) the aggregate of the money collected from the tenants minus (b) the reasonable expenses incurred in operating and managing rental operations at the property. The redemption price calculated under this interpretation of "rents" would equal the redemption price calculated by treating the challenged expenditures as maintenance and repairs under subdivision (b)(2) of section 729.060. Therefore, Borrowers would have suffered no prejudice so long as "rents" means net rents.

### C. Rents and Profits Are a Net Amount

Our analysis of the meaning of the phrase "rents and profits" begins with the dictionary definitions of each term.

The word "rent" means the consideration paid, usually periodically, for the use or occupancy of property, especially real property. (Black's Law Dict. (9th ed. 2009) p. 1410.) The word "profit" refers to the "excess of revenues over expenditures in a business transaction." (Black's Law Dict., *supra*, at p. 1329.)

We conclude the word "rents" is susceptible to more than one interpretation because it could refer to rents before or after expenses are deducted—that is, net rents or

gross rents. Because of this possibility, we conclude that the term "rents" in the phrase "rents and profits" used in subdivision (c) of section 729.060 is ambiguous.

A more formal definition of the term "net rent" is "[t]he rental price for property after payment of expenses, such as repairs, utilities, and taxes." (Black's Law Dict., *supra*, at p. 1410.) The term "gross rents" was defined by the court in *U.S. v. Real Property Located at Incline Village* (D.Nev. 1997) 976 F.Supp. 1327 to mean "the aggregate number of dollars collected from third parties as rents on the subject real properties, not discounted by any amount or for any reason." (*Id*. at p. 1349.)[8] These definitions adequately indicate the two different ways to interpret "rents."

As a general rule of statutory construction, courts should consider the consequences that will flow from the various interpretations under consideration. (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291.) An analysis of the consequences involves evaluating the results generated by a proposed statutory interpretation when it is applied to different factual situations that might arise.

Here, the statutory provisions governing the redemption price and offsets govern all the different types of real property that might be sold by judicial foreclosure. Thus, the interpretation adopted must make sense when applied to all types of property, without regard to (1) how the property subject to redemption has been used and (2) how many persons or occupants are intended to use the property. As to land use, common types are residential, commercial, industrial and agricultural. (*East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 740.) As to the number of users, a property might be designed for a single user or many separate users. For example, a

---

[8] As to rents' parallel term, "profits," we note that the terms "gross profits" and "net profits" do not apply in every business context. However, when the business in question sells goods, the term "gross profit" means total sales revenue less the cost of the goods sold with no adjustment being made for additional expenses and taxes and "net profit" means the total sales revenue less the cost of the goods sold and all additional expenses. (Black's Law Dict., *supra*, at p. 1329.)

property intended for residential use might contain a single-family dwelling or might contain many apartment buildings with multiple units in each building.

Therefore, the statutory interpretation we adopt must be workable when applied to a property containing a single-family residence and when applied to a multiple-unit, multiple use property. An example of this latter type of property would be a parcel that has been developed to include a strip of commercial buildings along a street, a row of apartment buildings located behind the commercial strip, and agricultural land (such as a still productive orchard) behind the apartment buildings that the owner might (or might not) develop at a future date. In such a case, if "rents" is interpreted to mean "gross rents" and not "net rents," a purchaser would not be able to recover the money spent managing the tenants of the commercial property and the apartment buildings. As a result, if the property was redeemed, the purchaser, for all practical purposes, would have donated those expenses to the redemptioner. This possibility does not appear to be intended by the Legislature. Nothing in the comments to the statutory provisions suggests such an approach. Also, placing such a burden on purchasers would have the effect of increasing purchaser risk and thereby reducing the price of multiple-tenant properties sold in judicial foreclosure.

Furthermore, if a purpose of the redemption statute is to place the purchaser of property subsequently redeemed in approximately the same position economically as the purchaser would have been in if the purchaser had not bought the property, then the statute should not be interpreted in a manner that results in a donation of management services and operating costs by the purchaser.

Interpreting "rents" to mean net rents is compatible with the use of "rents" in parallel with the word "profits." The ordinary meaning of the word "profits" takes into account a reduction for expenses. Thus, a parallel interpretation of the word "rents" leads to the conclusion it refers to net rent. Under this interpretation, the out-of-pocket expenses incurred by a purchaser at a judicial foreclosure sale to manage *rental property*

27.

would be treated in the same manner as out-of-pocket expenses incurred when the purchaser *directly manages the property and its output* and the redemption price is reduced by the profits (not the revenue) generated by the sale of the property's output.[9]

Finally, our conclusion that "rents" means net rents is supported by the rule of law applicable to mortgagees in possession *before* foreclosure that was quoted by the California Supreme Court in *Murdock v. Clarke* (1891) 90 Cal. 427, 429: "'If the mortgagee obtains possession of the mortgaged premises before foreclosure, he will be accountable for the actual receipts of the net rents and profits, and nothing more, unless they were reduced or lost by his willful default or gross negligence.'" (See *Dime Sav. Bank v. Altman* (1937) 275 N.Y. 62, 69-70 [9 N.E.2d 778] [statutory phrase "rents and profits" interpreted to mean net rents]; *Rae v. Sutbros Realty Corp.* (1958) 174 N.Y.S.2d 871 [6 A.D.2d 716].)

### D.    Application of Net Rents Interpretation to this Case

From the record presented and the extensive findings of fact made by the trial court, we conclude this matter need not be remanded to the trial court to apply the interpretation of "rents" as meaning net rents.

The trial court found the management fees and operating expenses were reasonable when it awarded them as part of the property's maintenance and repair. To determine whether additional findings of fact were necessary, this court sent the parties a letter for supplemental briefing asking whether the alleged misapplication of section

---

[9]    The most common example of a purchaser generating profits from the real property involves agricultural or timber operations where the purchaser runs the operations instead of leasing the property to a third party. (See *Fairchild v. Gray* (1930) 136 Misc. 704 [242 N.Y.S. 192] ["profits" from real estate means the produce of the land and includes herbage, wood, turf, coal, minerals, stone, fish in a pond or running water, crops and livestock]; *Smith v. Howell* (1918) 91 Or. 279 [176 P. 805] [owner may recover rents and profits from farmer in adverse possession, but not the full value of crops raised and harvested because the crop contains the labor of the farmer in addition to the value of the use of the land].)

729.060, subdivision (b)(2) was harmless error because the contested expenses treated as maintenance and repair would have had the same effect on the redemption price if "rents" was interpreted to mean net rents.  Borrowers answered that the error was not harmless, stating that "[f]urther findings of fact would be necessary only to the extent there is a lack of clarity as to what specific expenses erroneously added to the redemption price did not constitute specified expenses under §729.060(b)(2)-(b)(5)."  This answer is off point because Borrowers have not identified specific items the management fees and operating expenses allowed by the trial court as maintenance that, in their view, should not reduce the gross rent when calculating the net rent received by Wells Fargo.

Therefore, Borrowers have not shown "from the record that [the trial court's accounting for management fees and operating expenses under subdivision (b)(2) of section 729.060, instead of subdivision (c)] was prejudicial … and that a different result would have been probable if such [accounting had been done under subdivision (c) of section 729.060 in calculating net rent]."  (§ 475.)  Therefore, the trial court's ultimate determination of the amount of the redemption price contains no prejudicial error.

## DISPOSITION

The order determining redemption price is affirmed.  Wells Fargo shall recover its costs on appeal.  Borrowers' request for judicial notice filed on July 29, 2014, related to the certificate of redemption is granted.

_____

FRANSON, J.

WE CONCUR:

_____

GOMES, Acting P.J.

_____

DETJEN, J.

29.